KRIS WHITNEY & another *vs.* CITY OF WORCESTER & others.

Worcester.    September 15, 1976. — August 16, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Governmental Immunity.   Municipal Corporations,* Liability for tort, Officers and agents.   *Actionable Tort.   Public Officer.   School and School Committee.   Negligence,* Public school teacher, Public officer.

This court declared its intention to abrogate the doctrine of municipal immunity in the first appropriate case decided by it after the conclusion of the 1978 session of the Legislature, provided that the Legislature at that time has not itself acted definitively as to the doctrine. [210]

Discussion of the law of the Commonwealth with respect to municipal and governmental tort liability. [213-220]

Analysis of the personal liability in tort of public officers. [220-221]

This court declared its intention to abrogate the doctrine of governmental immunity as to all injuries occurring since the publication of the decision in *Morash & Sons* v. *Commonwealth,* 363 Mass. 612 (1973), provided that after the conclusion of the 1978 session the Legislature has not acted as to the doctrine. [225-226]

An action in tort against a city and certain of its employees was remanded to the Superior Court to be continued at least until definitive legislation as to governmental immunity is enacted or until the January, 1978, legislative session ends without the enactment of such legislation. [226]

CIVIL ACTION commenced in the Superior Court on November 21, 1974.

The case was heard by *Tisdale,* J., on motions to dismiss.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Robert Martin* for the plaintiffs.

*Henry P. Grady,* City Solicitor for the city of Worcester & others.

HENNESSEY, C.J.   The plaintiffs Kris Whitney (Kris) and his father, Glen A. Whitney (Whitney), brought this action in the Superior Court for Worcester County to recover for personal injuries and consequential damages caused by the alleged negligence of the defendants. The defendants in the original action were the city of Worcester, the members of the city school committee, the city superintendent of schools, the principal and assistant principal of the Downing Street School in Worcester, two elementary teachers at the school,[1] and the school custodian. The action was dismissed as to all defendants with the exception of the school custodian,[2] and the plaintiffs appeal from the final judgments of dismissal.

By this case we are again confronted with the question of the continued viability of the existing governmental immunity doctrine in this Commonwealth. On previous occasions we have voiced our conclusion that the governmental immunity doctrine and the convoluted scheme of rules and exceptions which have developed over the years are unjust and indefensible as a matter of logic and sound public policy. However, on those occasions we further concluded that comprehensive legislative action was preferable to judicial abrogation followed by an attenuated process of defining the limits of governmental liability through case by case adjudication. *Morash & Sons* v. *Commonwealth,* 363 Mass. 612 (1973). See *Caine* v. *Common-*

---

[1] The plaintiffs voluntarily dismissed their action against one of the two teachers prior to judgment below.

[2] The defendant custodian filed an answer to the merits, and pre-trial discovery was proceeding as to him when briefs were filed in this case. All other defendants filed motions to dismiss under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974).

*wealth,* 368 Mass. 815 (1975); *Hannigan* v. *New Gamma-Delta Chapter of Kappa Sigma Fraternity, Inc.,* 367 Mass. 658 (1975). Four years have passed since our decision in *Morash,* four years in which the Legislature has apparently been unable to formulate a workable solution.[3] We recognize the delicacy of the tasks with which the Legislature has been confronted, and we now conclude that the Legislature and the public are entitled to a more specific statement as to this court's intentions.

Accordingly, we state our intention to abrogate the doctrine of municipal immunity in the first appropriate case decided by this court after the conclusion of the next (1978) session of the Legislature, provided that the Legislature at that time has not itself acted definitively as to the doctrine. Thereafter, when appropriate cases concerning State and county immunity are presented, it is our intention to take similar action to abrogate immunity.[4] Since it will be seen, *infra,* that it is also our intention to abrogate the doctrine retroactively to the date of the *Morash* opinion, it is fitting that we should remand this case to the Superior Court with provisions for suitable continuance of the matter, pending legislative or judicial action. We enter such an order, *infra.*

While we believe that the four years which have elapsed since *Morash* have provided ample opportunity for legislative action, our forbearance at this time is guided by the practical consequences of the overlapping legislative and judicial powers in this area. Unlike many matters which are proper subjects for either judicial or legislative lawmaking, legislative action on the subject of sovereign immunity is almost sure to follow any action on our part, and the nature of the process is such that, barring any possible constitutional infirmities, the Legislature will have the final word.

---

[3] See Note, Governmental Tort Immunity in Massachusetts: The Present Need for Change and Prospects for the Future, 10 Suffolk U.L. Rev. 521, 524-526 (1976).

[4] The *Morash* case, in which we analyzed governmental immunity and its unacceptability, involved an action against the Commonwealth.

In virtually every jurisdiction in which the doctrine of sovereign immunity has been judicially abrogated, judicial action has been followed by legislative action which modified, and in some cases completely nullified, the action of the judiciary.[5] It is fair to say that in some States the legislative response to judicial abrogation has been precipitant, perhaps induced by legislative concern for fiscal uncertainties. We think it unsupportable that we should embark on a course which fails to give maximum encouragement to reasoned deliberation in this complex area of the law. Furthermore, we think it unfair to create in this area expectations which the Legislature may nullify. Nor do we have any wish to promote unnecessary possibilities of unequal treatment among litigants, as caused by the

---

[5] For a compilation of judicial and legislative action in this area throughout the country, see Restatement (Second) of Torts § 895A (Tent. Draft No. 19, 1973). The sequence of events in many States is illustrative of the basis of our concern. See, for example, Arkansas: local governmental immunity judicially abolished in *Parish* v. *Pitts,* 244 Ark. 1239 (1968), restored by statute, Ark. Stat. Ann. § 12-2901 (Cum. Supp. 1975); California: governmental immunity judicially abolished in *Muskopf* v. *Corning Hosp. Dist.,* 55 Cal. 2d 211 (1961), two-year moratorium on suits against governmental entities enacted by the Legislature, 1961 Cal. Stat. c. 1404; Colorado: governmental immunity judicially abolished in *Evans* v. *County Comm'rs of the County of El Paso,* 174 Colo. 97 (1971), restored in large degree by legislation, Colo. Rev. Stat. Ann. §§ 24-10-101 et seq. (1973); Illinois: local governmental immunity abolished in *Molitor* v. *Kaneland Community Unit Dist. No. 302,* 18 Ill. 2d 11 (1959), exceptions restored by statute, Ill. Ann. Stat. c. 85, §§ 1-101 et seq. (Smith-Hurd 1966), some exceptions declared unconstitutional under State constitutional provision prohibiting special legislation, *Harvey* v. *Clyde Park Dist.,* 32 Ill. 2d 60 (1965); Kansas: State proprietary immunity judicially abolished in *Carroll* v. *Kittle,* 203 Kan. 841 (1969), restored by statute, Kan. Stat. Ann. §§ 46-901 et seq. (1973); Maine: State and local immunity judicially abolished in *Davies* v. *Bath,* 364 A.2d 1269 (Me. 1976), detailed Maine Tort Claims Act establishing numerous exceptions subsequently enacted, 1977 Me. Acts c. 741; Michigan: local governmental immunity abolished in *Williams* v. *Detroit,* 364 Mich. 231 (1961), restored by statute for governmental functions, Mich. Stat. Ann. § 3.996 (107) (Supp. 1972), statute held unconstitutional for procedural reasons in *Maki* v. *East Tawas,* 385 Mich. 151 (1971); New Jersey: governmental immunity judicially abolished in *Willis* v. *Department of Conservation & Economic Dev.,* 55 N.J. 534 (1970), detailed New Jersey Tort Claims Act subsequently enacted, N.J. Stat. Ann. §§ 59:1-1 et seq. (West Supp. 1977-1978).

chance of dates of injuries or lawsuits, as related to the sequence of judicial and legislative actions.

As we noted in *Morash*, we have no doubt as to our power to abrogate the doctrine of governmental immunity. We also have no doubt that the time for change is long overdue. Massachusetts is one of only five remaining States which retain the common law immunity at both the State and local levels. Forty-five States have modified and at least partly eliminated the defense of immunity in tort actions against municipal corporations. All except thirteen States have abolished or limited the defense in suits against the State. Note, Governmental Tort Immunity in Massachusetts: The Present Need for Change and Prospects for the Future, 10 Suffolk U.L. Rev. 521, 523-524 (1976). See K.C. Davis, Administrative Law of the Seventies §§ 25.00-25.00-2 (1976). Should it become necessary for us to bring change by judicial action we will at that time embark on the task of restructuring our law of governmental tort liability to bring it into conformity with reason and sound public policy. Therefore, we think it a useful exercise for this court to state now the major principles which we intend to recognize if and when it becomes necessary for us so to restructure the common law.

As a preliminary matter, we stress that abrogation of governmental immunity need not necessarily mean that governmental entities would be liable for all harm which results from the conduct of their activities. As we stated in *Morash, supra* at 623, "[C]learly, there should be limits to governmental liability and exceptions to the rule of liability, based upon considerations of justice and public policy." See, e.g., *Spencer* v. *General Hosp.*, 425 F.2d 479 (D.C. Cir. 1969); *Muskopf* v. *Corning Hosp. Dist.*, 55 Cal. 2d 211 (1961); 3 K.C. Davis, Administrative Law § 25.11 (1958). We will discuss what we consider to be the appropriate limits of governmental liability later in this opinion.

In suggesting such limits of liability we have no wish to intrude on the prerogatives of the Legislature. Nevertheless, we are cognizant that the Legislature may wish to enact a comprehensive legislative scheme in place of

the formulation we present herein. With respect to any action the Legislature may take, the principles which we express in this opinion only suggest the balance of equities we think sound. We hope, of course, that the principles we stress here will aid the Legislature in its deliberations.

## I. *Municipality Liability.*

1. Under the existing law of the Commonwealth, it is well established that a municipality is not liable for negligent or otherwise tortious acts in the conduct of its schools. See, e.g., *Desmarais* v. *Wachusett Regional School Dist.,* 360 Mass. 591, 594 (1971); *Molinari* v. *Boston,* 333 Mass. 394, 395-396 (1955); *Reitano* v. *Haverhill,* 309 Mass. 118, 122 (1941); *Warburton* v. *Quincy,* 309 Mass. 111, 117 (1941); *Sweeney* v. *Boston,* 309 Mass. 106, 109-110 (1941); *Hill* v. *Boston,* 122 Mass. 344 (1877). This rule is a subset of a broader rule of immunity which insulates a municipality from liability for injury resulting from "negligent acts of its officers or employees in the performance of strictly public functions imposed or permitted by the Legislature from which no special corporate advantage, pecuniary profit or enforced contribution from individuals particularly benefited, results," *Orlando* v. *Brockton,* 295 Mass. 205, 207-208 (1936); *Bolster* v. *Lawrence,* 225 Mass. 387, 389 (1917), but which subjects a municipality to liability for the acts of its agents or employees "in the conduct of functions voluntarily undertaken for its own profit and commercial in character, or to protect its corporate interests in its own way."[6] *Bolster* v. *Lawrence, supra* at 390.

This rule itself is a curious amalgam of two initially separate doctrinal threads which were based on a distinction between municipal or "public" officers and municipal agents or employees. Municipalities have long been held immune from liability for the acts of public officers on the theory that such officers performed public duties imposed

---

[6] For examples of "commercial" enterprises, see *Morash & Sons* v. *Commonwealth,* 363 Mass. 612, 621 n.5 (1973).

by the Legislature and, hence, since there was no local control over the public officer, the doctrine of respondeat superior was inapplicable.[7] See, e.g., *Molinari* v. *Boston,* 333 Mass. 394, 395-396 (1955); *Johnson* v. *Somerville,* 195 Mass. 370, 377 (1907); *Moynihan* v. *Todd,* 188 Mass. 301, 304 (1905). The implication in many of our past cases was that the inquiry into possible municipal liability ended with the categorization of the alleged tortfeasor as a public officer, while, if the actor in question were properly classified as a municipal agent or employee, the inquiry would proceed to a second stage in which liability would attach if the agent/employee were engaged in a commercial activity of the municipality at the time of the tort. However, where plaintiffs have attempted to show that an activity conducted under the auspices of public officers was in fact commercial in nature, we have taken pains to show the noncommerciality of the venture before applying the public officer rule. See, e.g., *Reitano* v. *Haverhill,* 309 Mass. 118 (1941); *Warburton* v. *Quincy,* 309 Mass. 111 (1941); *Sweeney* v. *Boston,* 309 Mass. 106 (1941); *Orlando* v. *Brockton,* 295 Mass. 205 (1936).

While the basic rules have been buffeted about through the years, one basic principle of immunity emerges: "The underlying test is whether the act is for the common good of all without the element of special corporate benefit or pecuniary profit. If it is, there is no liability; if it is not, there may be liability." *Bolster* v. *Lawrence,* 225 Mass. 387, 390 (1917). The essential distinction in the law of the

---

[7] Given the existing sovereign immunity of the State, the rule had the effect of entirely precluding recovery from a governmental entity whenever the injury-producing actions were those of a public officer or of persons in the employ of public officers. See *Morash & Sons* v. *Commonwealth,* 363 Mass. 612, 617 (1973). Examples of persons who have been categorized as public officers by our past cases are: municipal school committee members, e.g., *Reitano* v. *Haverhill,* 309 Mass. 118 (1941); municipal superintendents of streets, e.g., *Anglim* v. *Brockton,* 278 Mass. 90 (1932); municipal tree wardens, *Leary* v. *Newburyport,* 216 Mass. 225 (1913); members of local boards of health, *Barry* v. *Smith,* 191 Mass. 78 (1906). And, of course, exceptions to this rule have been created. See, e.g., *Ryder* v. *Taunton,* 306 Mass. 154 (1940); *Ryder* v. *Lexington,* 303 Mass. 281 (1939).

Commonwealth has been one based on a concept of "public" functions versus "commercial" functions.[8]

2. Such rigid classifications of municipal activities and municipal personnel have served only to obscure the issue of whether a particular plaintiff should recover from a governmental entity for his injuries and to prevent the systematic and straightforward development of a rational scheme of governmental liability that is consistent with accepted tort principles and the reasonable expectations of the citizenry with respect to its government. A person who has been run over by a municipal truck can hardly be expected to appreciate the fine nicety of the distinction between the various functions in which the truck driver may have been engaged.[9] The "public" function immunity rests on the premise that such functions are performed for the common good of all, but it can hardly be termed sound public policy that some persons contribute only tax revenues to the commonweal while from others additional contribution is exacted in the form of uncompensated injuries caused by tortious conduct. Considerations of fairness alone would demand that the costs of government be borne by the entire community benefited.

Unfortunately, however, fairness to the injured individual cannot be the sole controlling factor in this context. Desirable as it might be to structure a system of cost-benefit distribution in which no tortious injuries would

[8] The long-standing distinction between public officers and municipal employees has effectively become superfluous through the years, since public officers by definition perform "public" functions, and generally have been considered agents of the municipality when an element of corporate profit redounding to the benefit of the municipal government or particular classes of its citizens was present. See, e.g., *Baumgardner* v. *Boston,* 304 Mass. 100 (1939). The confusion that the interplay of the two separate distinctions has created is nowhere more persuasively illustrated than in the public officer trilogy of *Sweeney-Warburton-Reitano,* cited above.

[9] An injured person, for example, may recover against a city or town because of the fortuitous circumstance that the injury was caused by the activity of water department employees, *D'Urso* v. *Methuen,* 338 Mass. 73 (1958), rather than by fire department employees, *Pettingell* v. *Chelsea,* 161 Mass. 368 (1894).

go uncompensated, the fact that we are here dealing with governmental entities vastly complicates the issue of the appropriate scope of tort liability. The oft-repeated premise that governmental entities should be liable for tortious acts in the same manner as private individuals is only the beginning of the analysis.

When there are specific allegations of tortious conduct[10] in the performance of governmental functions, the equation must proceed further in the interest of preserving the stability and effectiveness of government. We do not think it would be a wise exercise of our judicial power merely to discard the doctrine of governmental immunity without providing what we think is a sound and fair structuring of the appropriate limits of governmental liability. An appropriate balance should be struck between the public interest in fairness to injured persons and in promoting effective government. Finding no way to bring rational order into the existing scheme, we believe that this balance can be achieved only by completely restructuring the functional analysis which we have applied in the past. We originally delineated functional categories of activities and persons to conform with the controlling principle of governmental *immunity*. We now begin our analysis guided by a principle of governmental *liability* within limits.

3. The governmental immunity which attached to governmental functions and acts of public officers reflected two underlying premises: one, that public officers were in fact employed by the public at large rather than by the governmental entity, that public functions were performed for the benefit of the public and not of the municipal government itself, and that there was no way to exact compensation from the disembodied "public"; and, two, that

---

[10] The inquiry into governmental tort liability in a particular case must begin with a determination whether the conduct in question was in fact tortious. An essential function of governmental decision making is the allocation of resources and distribution of costs and benefits. Almost invariably, when one segment of the community is benefited, others may be injured in some sense. The normal governing processes are not themselves tortious, even though they may result in injury.

such activities, which often involve a high degree of discretion and judgment, should be insulated from a form of review which might impede governmental operations by subjecting governmental decision making to after-the-fact judicial tort analysis. The first premise is manifestly unsound, as there is obviously a source of funds behind every public function. However, the second premise retains its basic validity today, and provision must be made to continue the protection to good government afforded by that premise. But the old distinctions sweep far too broadly and maintain the immunity in large areas in which the imposition of tort liability could in no way hinder the effective operation of governmental processes.

We think that the appropriate dividing line falls between those functions which rest on the exercise of judgment and discretion and represent planning and policymaking and those functions which involve the implementation and execution of such governmental policy or planning. The appropriateness of such a dividing line has been widely recognized. The Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. (1970), contains an express exception to governmental liability for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government. . . ." *Id.* § 2680 (a). See, e.g., *Spencer* v. *General Hosp.,* 425 F.2d 479 (D.C. Cir. 1969); 3 K.C. Davis, Administrative Law § 25.13 (1958). Such a distinction is not unknown in our own law of governmental tort liability. For example, a governmental entity is not liable for negligence in the planning of sewers but may be liable for negligence in their construction and maintenance. See, e.g., *Lobster Pot of Lowell, Inc.* v. *Lowell,* 333 Mass. 31, 33 (1955), and cases cited therein.

Legislatures in at least eighteen States have adopted a similar discretionary function exception. See Alaska Stat.

§ 09.50.250 (1) (1973); Cal. Gov't Code § 820.2 (Deering 1977); Haw. Rev. Stat. § 662-15 (1) (1968); Idaho Code Ann. § 6-904 (1) (Cum. Supp. 1976); Ill. Ann. Stat. c. 85, § 2-201 (Smith-Hurd 1966); Ind. Code Ann. § 34-4-16.5-3 (6) (Burns) (Cum. Supp. 1976); Iowa Code Ann. § 25A.14 (1) (West Cum. Supp. 1977-1978); 1977 Me. Acts § 8103; Minn. Stat. Ann. § 466.03 (6) (West 1963); Neb. Rev. Stat. § 23-2409 (2) (1974), and § 81-8219 (1) (a) (1976); Nev. Rev. Stat. § 41.032 (2) (1975); N.J. Stat. Ann. § 59:2-3 (West Cum. Supp. 1977-1978); Okla. Stat. Ann. tit. 11, § 1754 (5) (West Cum. Supp. 1976-1977); Or. Rev. Stat. § 30.265 (2) (d) (1975); Tenn. Code Ann. § 23-3311 (1) (Cum. Supp. 1976); Tex. Rev. Civ. Stat. Ann. art. 6252-19 14 (7) (Vernon 1970); Utah Code Ann. § 63-30-10 (1) (Supp. 1975); Vt. Stat. Ann. tit. 12, § 5602 (1) (1973).

Under the formulation which we set forth in this case, we shift our focus from the nature of the governmental enterprise as a whole and the capacity in which the officer/agent was acting to the specific act or omission complained of as tortious. When the particular conduct which caused the injury is one characterized by the high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning, governmental entities should remain immune from liability. "To inquire into such decisions in a tort suit might 'jeopardiz[e] the quality and efficiency of government itself,' and endanger the creative exercise of political discretion and judgment through 'the inhibiting influence of potential legal liability asserted with the advantage of hindsight.'" *Spencer* v. *General Hosp.*, 425 F.2d 479, 488 (D.C. Cir. 1969) (Wright, J., concurring), quoting from *Elgin* v. *District of Columbia*, 337 F.2d 152, 154-155 (D.C. Cir. 1964). On the other hand, when the particular conduct claimed to be tortious involves rather the carrying out of previously established policies or plans, such acts should be governed by the established standards of tort liability applicable to private individuals or entities and the governmental entity in question held liable for the

injuries resulting from such acts.[11] This test would be ap-
plied regardless of whether the individual tortfeasor would
previously have been classified as a public officer, an em-
ployee of a public officer, or a municipal employee.

We are cognizant of the irony inherent in substituting a
new distinction for the old ones after our repeated criti-
cism of the distinction drawing process in this context.
However, we are confident that future case by case refine-
ments of the general rule which would be necessary to de-
fine the specific parameters of governmental liability would
evolve a fair and rational balance of the competing inter-
ests at stake.

Recognizing as we do that the general rule we would
adopt is hardly a model of precision and predictability,
we will attempt here to sketch in some of the larger inter-
stitial gaps. The line to be drawn cannot merely be one
between functions which involve discretion and judgment
and those which do not, for the performance of all func-
tions involves the exercise of discretion and judgment to
some degree.

In examining particular acts or omissions in particular
cases to determine whether liability will or will not attach,
the following inquiries are relevant: Was the injury-pro-
ducing conduct an integral part of governmental policy-
making or planning? Might the imposition of tort liability
jeopardize the quality and efficiency of the governmental
process? Could a judge or jury review the conduct in ques-
tion without usurping the power and responsibility of the
legislative or executive branches? Is there an alternate
remedy available to the injured individual other than an
action for damages? These considerations, in a particular
case, indicate whether governmental immunity should at-
tach. Where such considerations are not determinative,
governmental liability should be the general rule. Other
relevant considerations are the reasonable expectations of

---

[11] Governmental entities are already liable as private individuals in
nuisance, and we would intend no change in such liability. See *Morash
& Sons* v. *Commonwealth,* 363 Mass. 612, 616 (1973), and cases cited
therein.

the injured person with respect to his relationship to the governmental entity in question, the nature of the duty running from the government to the governed in the particular case, and the nature of the injury.

## II. *Personal Liability of Public Officers.*

In many cases the classification of a tortfeasor as a public officer at present cloaks him, and consequently the city, with immunity from liability for his actions. "[P]ublic officers engaged wholly in the performance of public duties are liable only for their own acts of misfeasance in connection with ministerial matters." *Fulgoni* v. *Johnston*, 302 Mass. 421, 423 (1939). "[N]egligence which amounts to nothing more than an omission or nonfeasance creates no liability. . . . [N]onfeasance is the omission of an act which a person ought to do, misfeasance is the improper doing of an act which a person might lawfully do." *Trum* v. *Paxton*, 329 Mass. 434, 438 (1952). With respect to nonministerial matters, "if a public officer . . . is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby. This rule is presently limited to public officers acting in good faith, without malice and without corruption" (footnote omitted). *Gildea* v. *Ellershaw*, 363 Mass. 800, 820 (1973).

It can be argued that there are sound and rational reasons of public policy which support the retention of the misfeasance-nonfeasance distinction. Public officers generally exercise a broad range of discretion and judgment, and elements of that discretion and judgment are inextricably implicated even in functions which would be classified as ministerial. Subjecting public officers to personal liability only when they have engaged in overt and actively tortious conduct in ministerial matters effectively places a ceiling on their personal exposure in the performance of

vital governmental functions. It can be argued that such a ceiling is appropriate in the interest of ensuring diligent and creative performance of public duties and further ensuring that capable individuals will not be deterred from entering public service by fear of personal liability for their conduct.

Nevertheless, in the past, the achievement of this purpose often resulted in unjust decisions in particular cases, because unless the tortious conduct alleged constituted misfeasance in a ministerial matter, neither the public officer nor the governmental entity would have been liable for the injury done. For that reason we would abandon the misfeasance-nonfeasance distinction as a relevant factor. Personal immunity of the public officer, indeed that of public servants, would be determined by the discretionary-ministerial criteria discussed *supra*. Continued assurance that public officers will perform their duties effectively, free of inordinate fear of personal liability, may be achieved by the municipalities' providing indemnity for employees, by insurance or otherwise, under statutes such as G. L. c. 40, § 5, or G. L. c. 41, §§ 100A, 100C, 100D.

The soundness of our intention is clear when the cases involving the misfeasance-nonfeasance analysis are examined. Decisions as to immunity should not be influenced by the finite distinctions drawn in these cases, distinctions which have no real connection with sound reasoning or policy. See, e.g., *Desmarais* v. *Wachusett Regional School Dist.*, 360 Mass. 591 (1971); *Trum* v. *Paxton*, 329 Mass. 434 (1952); *Fulgoni* v. *Johnston*, 302 Mass. 421 (1939); *Moynihan* v. *Todd*, 188 Mass. 301 (1905).

III. *The Application of these Principles to the Case Now before Us.*

We can perhaps best illustrate the principles discussed above through an examination of the allegations in the case now before us. The complaint in this case alleges that Kris Whitney, a six-year-old first grader at the Downing Street School in Worcester who was totally blind in his left eye and had limited vision in his right eye due

to congenital glaucoma, was totally blinded as a result of his being struck on the head by a defective door at the school. The specific allegations of negligence are: (1) that the defendant school committee members adopted a policy of integrating handicapped children into the public schools, which policy was implemented by the defendant superintendent of schools, as a result of which Kris was assigned to the school at which he was injured, but that these defendants failed to provide any special supervision or assistance for Kris or other handicapped children who were integrated into the public school system under this policy; (2) that although on the morning of the accident Whitney had advised Kris's classroom teacher, also a defendant in this case, that Kris was suffering from hemorrhaging of his sighted eye which further impaired his vision, Kris was directed to proceed to afternoon recess in the school yard, which required passing through school corridors, down stairs, and out the allegedly defective door without any supervision or assistance; (3) that the door through which Kris was required to pass had been for some time in a dangerous and defective condition, and that the door had a defective closing mechanism which caused it to swing shut and strike Kris on the head; (4) that, after the accident, the defendant assistant principal and classroom teacher ordered Kris to remain in his classroom and did not obtain immediate medical attention for him, without which delay the total blindness which ensued as a result of the defendants' negligence could have been averted.

As to the personal liability of the individual defendants, all except the school custodian function as public officers. In summary, the complaint makes three claims of misfeasance on the part of public officers: one, that Kris's classroom teacher ordered him to leave the classroom and go to recess; two, that after the accident, his teacher and the assistant principal of the school ordered Kris to remain in the classroom; three, the school committee members and the superintendent of schools ordered Kris to attend the particular school at which he was injured. With respect to the first two allegations of misfeasance, the es-

sence of the complaint is in fact that these defendants failed to take appropriate action in the circumstances which were known or should have been known to them at the time. Under our prior decisions, the nonaction of the officers would not be considered to be misfeasance, and the officers would consequently be immune from liability. The teacher's "order" to Kris to proceed to recess in the course of normal school routine without supervision is directly analogous to the order of the teacher in *Desmarais* v. *Wachusett Regional School Dist.*, 360 Mass. 591 (1971), to his students to perform chemical experiments without enforcing the wearing of safety glasses. As to the alleged negligence in ordering Kris to remain in school after the accident, the complaint itself makes clear that any negligence there may have been lay not in the doing of an act but rather in the defendants' failure to seek immediate medical attention for Kris.

The conduct raised in these two allegations is clearly ministerial. Under the new principles which we would establish, the officers (and consequently the city) would not be immune, although there was no misfeasance.[12] This result would accord with the policies we have espoused, *supra*, as within our "intentions." We do not think that the imposition of liability for such conduct has major implications with respect to the provision of public education. While this conduct undoubtedly did involve the exercise of judgment and discretion, the nature of that judgment is not qualitatively different from the judgments of private individuals which are reviewed every day through the mechanism of an action in tort. Personal injury from defective premises or from the negligence of those into whose care they are entrusted is not a risk that schoolchildren should, as matter of public policy, be required to run in return for the benefit of a public education.

---

[12] We mean to intimate no conclusions regarding whether such conduct was in fact negligent or whether the allegedly defective door and the failure to seek medical attention, or either of these circumstances, was the proximate cause of Kris's blindness.

With respect to the third general allegation of misfeasance, the conduct of the school committee members and the superintendent of schools would, even under our proposed new principles, fall outside the scope of liability, for the alleged conduct is discretionary rather than ministerial. The conduct of these defendants falls rather within the rule of *Gildea* v. *Ellershaw*, 363 Mass. 800 (1973), for the alleged negligence in ordering Kris to attend this particular school cannot be separated from the policymaking and planning functions of school administration, and no liability thereby attaches to the public officers or to the city. The adoption of a plan to integrate handicapped pupils fully into the public schools falls precisely into the area of retained immunity. Such a plan is an integral part of basic educational policy planning involving complex considerations such as weighing the special needs of handicapped children against the potential benefit to them both educationally and emotionally of integration with nonhandicapped pupils, the manner in which school resources should be allocated, the manner in which pupils should be assigned to particular schools, and the number and duties of school personnel.

We think it inappropriate for courts to examine the soundness of such decision making in an action for damages. Aside from the obvious danger that subsequent events may cause a decision arguably reasonable at the time it was made to appear unwise in light of after-acquired data, there is no assurance that judges or juries, even if they could confine their scrutiny to the information which was available at the time the decision was made, are more competent to make a "right" choice than those charged with the responsibility for doing so. We think that the allegations of negligence on the part of the superintendent of schools and the school principal are governed by the same principles, as their conduct was dictated by the school committee plan. As to the acts of these defendants, there can be no personal or municipal liability based on the allegations contained in the complaint.

## IV. *The Issue of Retroactivity.*

While there was widespread and justifiable reliance on the immunity doctrine prior to our decision in *Morash & Sons* v. *Commonwealth,* 363 Mass. 612 (1973), we think that subsequent to that opinion further reliance was misplaced. Accordingly, if the doctrine is to be changed by future action of this court, it is our intention to abrogate the principle as to all injuries which occurred since the publication of *Morash* on May 14, 1973.[13]

We think that sufficient evolution has occurred in the law of governmental liability, in the imposition of liability in previous cases, in the warnings we have given regarding our intent to abolish the doctrine of governmental liability, and in the voluntary assumption of liability under enabling statutes, that we need not confine the rules forecast in this case to solely prospective operation.[14] Further, as a matter of sound administration and fairness, we add that where claims against governmental entities or officers have been concluded by judgments prior to the date of any change in the law, petitions to vacate such judgments should be disposed of in accordance with just application of relevant statutes, rules of court and the principles expressed in this opinion.

The fiscal consequences of retroactivity are potentially immense, as such a ruling would expose governmental entities to liability in tort for all causes of action on which the statute of limitations had not yet run.[15] However, we think that the modified retroactivity forecast here would

---

[13] Such a ruling would do no injustice to the unsuccessful litigants in the other post-*Morash* cases challenging the scope of governmental immunity which have reached us, because in all three cases the injury for which recovery was sought occurred prior to *Morash.* See *Piotti* v. *Commonwealth,* 370 Mass. 386 (1976); *Caine* v. *Commonwealth,* 368 Mass. 815 (1975); *Hannigan* v. *New Gamma-Delta Chapter of Kappa Sigma Fraternity, Inc.,* 367 Mass. 658 (1975).

[14] See R. Keeton, Venturing to do Justice 41-43 (1969).

[15] See G. L. c. 260, §§ 2A, 4, 7.

not have disastrous fiscal consequences. Our proposed action will not subject governmental entities to liability for all pecuniary injury. Further, we take notice that municipalities customarily, although perhaps not invariably, indemnify officers and employees for their tort liability on a voluntary basis. See G. L. c. 40, § 5; G. L. c. 41, §§ 100A, 100C, 100D.

## V. *Conclusion.*

The case is remanded to the Superior Court. The order previously entered in that court, dismissing the action as to some defendants, is to be vacated. Trial of the case, if any party so moves, shall be continued at least until definitive legislation as to governmental immunity is enacted, or until the January, 1978, legislative session ends without the enactment of such legislation. Similar cases involving other litigants, including cases asserting liability against the Commonwealth or any political subdivision of the Commonwealth, shall be entitled to similar treatment, on motion of any party. Interlocutory proceedings not inconsistent with this opinion may be pursued during the interim period.

*So ordered.*