Lorie P. GREEN
by Her Mother and Best Friend
Patricia E. GREEN
vs.
COMMONWEALTH
OF
MASSACHUSETTS

C.A. No. 3357

Superior Court Department
Trial Court of the
Commonwealth of Massachusetts

October 23, 1980

plaintiff.
defendant.

## MEMORANDUM OF DECISION

This is a tort action against the Commonwealth arising out of an incident which occurred on March 1, 1974. The action of the Legislature abolishing governmental immunity in large measure applies only to causes of action arising on or after August 16, 1977, St. 1978, c. 512, § § 15, 16, and thus has no application here. Likewise, governmental immunity had not been impaired as to actions of this nature in 1974. Vaughan v. Commonwealth, Mass. Adv. Sh. (1979) 1070. Cf. Morash & Sons, Inc. v. Commonwealth, 363 Mass. 612

(1973) (Commonwealth liable at common law for creating or maintaining a private nuisance which causes injury to the real property of another) Thus, the threshold question presented is whether the plaintiffs can maintain this action at all.

## 1. Governmental Immunity

As the common law stood at the time of this incident, "the underlying test [i.e., the basic issue presented] is whether the [governmental] act [alleged to be negligent] is for the common good of all without the element of special corporate benefit or pecuniary profit. If it is, there is no liability; if it is not, there may be liability." Bolster v. Lawrence, 225 Mass. 387, 390 (1917) (Rugg, C.J.). As recently as Whitney v. Worcester, 373 Mass. 208, 214 (1977), the Supreme Judicial Court admitted that "while the basic rules have been buffeted about through the years, [this] one basic principle of immunity emerges". Attempting to follow this distinction, the court has imposed liability in actions arising out of the management of a farm, Ness v. Wellesley, 148 Mass. 487 (1889), negligently constructing, maintaining and repairing sewers, Manning v. Springfield, 184 Mass. 245 (1903), operating a stone crusher, Duggan v. Peabody, 187 Mass. 349 (1905), operating a ferry, Davies v. Boston, 190 Mass. 194 (1906), maintaining a lighting plant, O'Donnel v. North Attleborough, 212 Mass. 243 (1912), leasing beachfront lots, Davis v. Rockport, 213 Mass. 279 (1913), maintaining a water system, A. daPrato Co., v. Boston, 334 Mass. 186 (1956), and negligently repairing a roadway. Butman v. Newton, 179 Mass. 1 (1901). Waldron v. Haverhill, 143 Mass. 582 (1887). But see Murphy v. Needham, 176 Mass. 422 (1900) (no municipal liability for negligent repair of street). In contrast, it has been held that no governmental liability arises from a fraudulent tax assessment, Hathaway v. Everett, 205 Mass. 246 (1910), the negligence of a tax collector, Auger v. New Bedford, 265 Mass. 327 (1928), the negligence of a fire department, Abihider v. Springfield, 277 Mass. 125 (1931), the negligent diversion of water onto private property, Anglim v. Brockton, 278 Mass. 90 (1932), the refusal to grant a garbage permit, Malden v. MacCormac, 318 Mass. 729 (1945) and from the negligent maintenance of a steam radiator in a school, Molinari v. Boston, 333 Mass. 394 (1955).

The decisions lend themselves to no easy systematization. Indeed, the Commonwealth argues strenuously that this distinction is without validity. Its cogent comments upon the subject are worthy of quote:

The "proprietary" doctrine is obsolete. It has been criticized from every quarter as an unworkable doctrine which has caused confusion and disparate results. Antieau in his treatise on Municipal Law [,] vol. IA [,] states that the doctrine is subject to merited and constant criticism [and is?] gradually becoming passe. . . . The Restatement has abandoned the distinction between "governmental" and "proprietary" functions and treats it as a [sic] historical oddity. See Restatement 2d of Torts § 895C Comment (e) at 34. The distinction between "governmental" and "proprietary" functions of government for purposes of tort immunity has been almost universally condemned. In the words of Harper & James: "No satisfactory test has been devised for distinguishing governmental from proprietary functions." [2 F. Harper & F. James, The Law of Torts § 29.6 at 1621 (1956).] An[d] Professor Davis has argued: "The [proprietary-governmental] distinction is probably one of the most unsatisfactory known to the law. . . ." The Supreme Court has referred to the " 'non-governmental' — 'governmental' quagmire that has long plagued the law of municipal corporations," and has condemned the distinction as "inherently unsound". [No citation in original.] There is on the face of it little logic in the "governmental-proprietary" distinction. . . . In addition to the works of Davis, Harper & James, representative among the voluminous criticism of the governmental-proprietary distinction are Borchard [,] Governmental Liability in Tort, 34 Yale L.J. 129, 134-143 (1924),

and Fuller & Casner, Municipal Tort Liability in Operation, 54 Harv. L. Rev. 437, 443 (1941).

Ironically, however, the Commonwealth concludes from all this that no liability ought attach even if the conduct is proprietary whereas the quoted commentators, to a man, emphasize the blurriness of the distinction as a ground for extending governmental liability and abrogating sovereign immunity.

In any event, the law of this Commonwealth as it stood on the date in question drew the distinction the Commonwealth criticizes and this court has no choice but to apply it here.

Accordingly, I turn to the analysis of Chief Justice Rugg in Bolster v. Lawrence, 225 Mass. 385 (1917) for instruction. In that case, the plaintiff's intestate met his death when a bathhouse maintained and operated by the City of Lawrence for public swimming collapsed due to the negligence of the City and its servants. Chief Justice Rugg confirmed the public nature of the activity as follows:

> The maintenance of free public baths upon the bank of a river is in its essence a public benefit. It is manifestly in the interests of the public health that the people have abundant facilities for cleanliness. Opportunity for swimming under sanitary conditions and under the protection and with the instruction of public officers tends toward the amusement of the people as well as their healthful and athletic exercise. It belongs to the same class of public service as municipal playgrounds and swimming pools for small children. It is a kind of social advantage which the Commonwealth long has provided at Nantasket and Revere beaches on a considerable scale. It is in its intrinsic characteristics a project for the general good of all the public. Id. at 390-391.

The incident giving rise to the case at bar occurred at the Francis L. Murphy Memorial Rink in South Boston, which skating rink is operated by the Metropolitan District Commission. This activity is indistinguishable in fact and law from maintenance of the bathhouse involved in Bolster v. Lawrence.

But analysis cannot end at this point. In dicta, Chief Justice Rugg noted that, under the statutory scheme, the City of Lawrence had the power to charge a fee for the use of its bathhouse "and thus possibly to derive a revenue or profit from the undertaking". Id. at 391. Even this possibility gave the case a "doubtful aspect" and caused him, as was his wont, to discuss a series of cases from which he derived the unifying principle "that the comparatively insignificant element of income received [in the cases discussed] did not affect the dominating public character of the enterprise, and did not render the city liable for the torts of public officers and servants in performing such public duty". Id. at 392.

The "doubtful aspect" of Bolster v. Lawrence which occasioned Chief Justice Rugg's dicta is of central concern to the case at bar. Far from simply authorizing the charging of fees as was the case in Bolster v. Lawrence, the Legislature here, in authorizing and directing the Metropolitan District Commission to construct skating rinks expressly provided that the Metropolitan District Commission shall charge reasonable fees to cover costs of maintenance and operation of "said skating rinks and amortizing so much of the loan authorized in Section 3 as may be required for the construction thereof." St. 1955, c. 731, § 2. It is thus clear that the Legislature's original intention in authorizing the construction of the rink in question was to require the facility to pay for itself over time. It is true, however, that this requirement was never fulfilled, the revenue predictions apparently being overly sanguine. Instead, as the Commonwealth points out, all its rinks have operated at substantial deficits. Nevertheless, the income therefrom is hardly insignificant. In the fiscal year 1974, income from fees for use of the Francis L. Murphy Memorial Rink aggregated $25,377.00 while expenditures were $120,378.00. During the same period, receipts from all the Metropolitan District Commission skating rinks aggregated $613,233.01, more than three times as much as the income from the Commission's next largest income-producing account — the MDC golf course in the Blue Hills.

Moreover, the fees charged by the Metropolitan District Commission in 1974 for the use of its skating rinks were comparable to those charged by the private owners of the Commonwealth's thirty-seven private skating rinks. Both the private rinks and the MDC rinks drew from the same general clientele, variations being due primarily to geographic location. In short, a skating rink operated by the Metropolitan District Commission was, in 1974, directly competitive with a skating rink under private ownership. For all of the reasons expressed above, I conclude that the operation of the Francis L. Murphy Memorial skating rink was, in 1974, sufficiently impressed with the element of pecuniary effort, albeit no profits were actually derived, that, notwithstanding the public nature of the undertaking, the Commonwealth may be properly subjected to liability for the negligence of its servants and employees in carrying on this endeavor. Indeed, the importance of the pecuniary element is reinforced by considering that, to the extent the skating rink operated at a loss, that loss had necessarily to be made up by assessments upon the individual towns and cities within the Metropolitan district. See Ex. 7; p. 42.

Finally, the Commonwealth argues that even if a municipality might be held liable under these circumstances, it ought escape liability since the Metropolitan District Commission is the representative of the sovereign. There is no merit in this distinction. Morash & Sons, Inc. v. Commonwealth, 363 Mass. 612, 619 (1973) ("We are not reluctant to extend the specific doctrinal exception here from the municipality to the Commonwealth, since there is no logical reason why we should not do so. On the contrary, the appeal to justice which created the exception in the one instance supports its application in the other").

## 2. Negligence

The Francis L. Murphy Memorial Rink has a number of well-designed safety features. Prominent among them is the design of the manager's office adjacent to the foyer of the rink. This office, with glass windows looking out both on the foyer and the skating area, provides an alcove for the ticket taker and facilities for the skate guards. The room, which is capable of being locked, also houses the control panel for the rink lights. Incidents of rowdyism in the first few months of 1974 prompted the assignment of a policeman, "usually" on duty in the rink lobby.

On Friday evening, March 1, 1974, Lorie Green, then age nine, came to the rink in the company of some of her friends and their mother. She was admitted with her friends, each child paying a twenty-five cent fee. The lobby was boisterous as they donned their skates, toughs rolling refuse barrels about on the floor. No policeman was on duty that evening and the skate guards were occupied out on the ice. Although the ticket booth was manned, the manager's room was occupied only by the first aid matron, the manager having traded offices with her.[1] Frightened, Lorie and her friends quickly went out onto the ice and commenced skating.

The ice was well patrolled and its surface apparently free from defects, a zamboni cleaning the ice at appropriate intervals. However, while Lorie Green and her party were skating, the matron fell ill and left for home without signing out. The assistant manager, on duty that night, was thus unaware that she had left the manager's office, leaving only the ticket taker there in attendance in his alcove. Shortly before 9:00 p.m., the ticket taker left the manager's office to go down the hall to the cashier's office to count his receipts. This left the manager's office entirely unattended. The lock to the door was broken and the ticket taker thus could not lock the area.[2]

At this juncture, a group of toughs similar to those who had created disturbances at the rink in the past, happened onto the premises, slipped into the manager's unattended office, and turned out the lights in

[1] Switching the first aid matron to the centrally located manager's office had the advantage of making her more immediately available to those in need and gave the manager a quieter, and perhaps more secure, operating office down the hall. As will be seen, however, this shift was a contributing cause of the ensuing incident.

[2] This lock had been repeatedly broken in the past. The Commonwealth was thus on notice that its attempts to secure the area were inadequate.

the rink. At once the skating area fell into an uproar. The skate guards tried to clear the ice and Lorie Green skated to the dash-boards but could not leave the ice because these same rowdies were holding the dash-boards closed to add to the confusion. She then started to skate towards a skate guard whom she knew when she was knocked to the ice and some unknown person skated across her left hand. She suffered a trau-matic amputation on her left thumb between the first and second joints.

Upon these findings, I conclude that the Commonwealth through its agents has been negligent in the supervision of safety at the Francis L. Murphy Memorial Rink on the evening of March 1, 1974, and that negli-gence proximately caused injury to Lorie Green.

### 3. Damages

Lorie Green did not faint upon the amputation of her thumb. As skate guards, bystanders, and a policeman who had just arrived on the scene tried to help her, she screamed for her sister. In the confusion, her sister could not be found and, in her terror, Lorie Green found herself unable to speak. She testified that her back hurt intensely and that her throat was clogged. So frightened was she that she had to spell out her telephone number with her finger on a skate guard's chest. With reasonable dispatch, Lorie Green was then taken to a nearby hospital and her parents notified.

There followed a series of operations which resulted in a most remarkable physi-cal reconstruction of Lorie Green's thumb. First, skin was taken from the right side of her groin area to cover the amputation site. This first operation left but a small scar high up on her inner thigh. Once this first opera-tion had healed, her hand was sewn to her chest below the bust line for a period of three weeks. Once the skin on the remainder of her thumb had fully bonded to the skin on her chest, a sufficient portion of skin on her chest was cut away and rolled to form a housing for the reconstructed thumb. In addition to being a painful operation, the site of the skin excision on her chest became infected, necessitating further corrective measures. Ultimately, skin was grafted from her right hip to cover the area of skin removed from her chest. Unavoidably, Lorie Green now has a rough square scar the size of a paper clip box just below her bust line. A lesser scar was necessarily left on her right hip in the area where the skin neces-sary for grafting had been removed. The scar on her right hip is cosmetically less serious than the scar on her chest which will be visible should she wear a two-piece bathing suit. Lorie herself vividly describes the pedicle of skin removed from her chest and attached to her thumb area as a "moldy hotdog" at first which later came to look like a "jelly roll".

Approximately ten months after the amputation, doctors performed yet another operation on Lorie Green, taking a sliver of bone from her left shin and inserting it in the pedicle of skin attached to her thumb to give it rigidity. This operation left only a faint scar on her left leg but, when Lorie first tried to walk following the operation, she fell and, for a time, feared she would never walk again. Finally, an incision was made running from her left index finger to the reconstructed thumb and a portion of the nerves supplying sensation to the index finger was rerouted into the reconstructed thumb.

The results of these many operations are truly remarkable. From a distance, Lorie Green has what one perceives as a normal left hand although I noted during the course of these proceedings that she tends to conceal it when possible. Upon closer inspection, the reconstructed thumb is slightly larger in diameter than its normal counterpart on her right hand and it remains cylindrical to the tip rather than tapering. Naturally, the reconstructed thumb is with-out a fingernail, and, having no internal joint, it remains rigid throughout its length. The reconstructed thumb is but slightly more reddish than normal skin coloration. It has both sensation and warmth to the touch. While the very end of the recon-structed thumb sometimes splits and bleeds, Lorie Green has achieved a fair degree of manual dexterity in her left hand. Compen-sating for the rigidity in her left thumb, she can nevertheless grip large objects, albeit not with the strength of a normal hand. She can even assay fine work although button-

ing small buttons or threading a needle area, not surprisingly, difficult if not impossible. By the time of these proceedings, she had reached an end result and, while her attending physician noted that normal skin color might be restored to the reconstructed thumb by grafting skin from the soles of her feet, he opined that the pain attendent upon such an operation would outweigh any cosmetic benefits hoped to be achieved.

While I find that Lorie Green will have a permanent partial disability as a result of this incident, I discount much of the evidence presented by the plaintiffs in an attempt to establish the monetary value of this disability since that evidence dealt only with the degree to which she would be barred from modeling or performing various jobs requiring the use of her left hand in detail work. No evidence was adduced to demonstrate that she does not have the capacity for professional training such that she would not need to use her left hand in that fashion.

As a result of this incident, the parents of Lorie Green incurred doctor bills aggregating $1,634.00 and hospital bills aggregating $5,332.34.

Accordingly, judgment will enter for Patricica Green, the parent and next friend of the plaintiff Lorie Green, in the amount of $6,966.34 and, in view of the pain and suffering visited upon Lorie Green, her permanent partial disability, and the mental anguish resulting from this incident, Lorie Green shall recover judgment against the Commonwealth of Massachusetts in the sum of $130,000.00. Cf. doCanto v. Ametek, Inc., 367 Mass. 776, 778, 787-788 (damages of $440,000 held not excessive where a twenty-nine year old woman lost four fingers and ninetyfive percent of the function of her dominent hand as a result of an industrial accident which trapped her hand in an ironer and occasioned four operations during about eight weeks of hospitalization).

So ordered.
William G. Young
Justice of the Superior Court