MILES PLUMBING & HEATING CO., INC. *vs.*
CITY OF BROCKTON.

Plymouth.  September 16, 1983. — October 27, 1983.

Present: PERRETTA, KAPLAN, & WARNER, JJ.

*Governmental Immunity.  Municipal Corporations,* Liability for tort, Sewer, Drain. *Drain.  Water.*

Discussion of municipal tort liability respecting drainage and sewer systems prior to the amendment of G. L. c. 258 by St. 1978, c. 512. [35-37]

In an action against the city of Brockton, the plaintiff could not recover for damage done to its goods through overflow from drainage and sewer pipes where the cause of action had arisen prior to the effective date of St. 1978, c. 512. [38-39]

CIVIL ACTION commenced in the Superior Court Department on April 17, 1979.

The case was heard by *Prince, J.*

*Frank A. Gaynor, III,* for the plaintiff.

*Joseph I. Sousa,* Assistant City Solicitor, for the defendant.

KAPLAN, J.  As the events in suit occurred before the sweeping legislative reform of the doctrines of governmental immunity (St. 1978, c. 512, G. L. c. 258), we have to apply the convoluted and rather arbitrary common law of the subject.  See the comments on the older law in *Whitney* v. *Worcester,* 373 Mass. 208 (1977).

The plaintiff, Miles Plumbing & Heating Co., Inc., sued the city of Brockton for damage done to its goods through overflow of water and sewage, caused, so the plaintiff alleged, by negligence of the city.  There was also a claim of nuisance relating to the runoff from a municipal parking lot.  After answer setting forth denials and a reference to the immunity doctrine, the case was tried to a judge of the Superior Court, who held for the city.

1. *Facts found.* The record consists of the judge's find-
ings, rulings, and order for judgment, together with a few
excerpts from the testimony. On this basis we recount the
facts as far as needed.

The plaintiff, a wholesale-retail plumbing supply busi-
ness, occupied a building on the west side of Montello
Street. The block is bounded on the north by Court Street,
and on the south by Franklin Street. Behind, i.e., to the
west of the building, is the plaintiff's parking lot, and ad-
joining and to the west of that lot is a municipal parking lot.
Rain and other waters accumulating on the streets of the
area, after reception in catch basins and drains, are carried
off underground by a twelve-inch pipe running east on
Franklin, which joins an eighteen-inch pipe running south
to north on Montello (termed a "main drain"), which joins
a fifteen-inch pipe running east on Court to its intersection
with Montello. The water at that point enters a thirty-four
inch brick conduit (also termed a "main drain") running
further east on Court, reaching eventually the Salisbury
River. The city's water drainage system is under the juris-
diction of the highway department.

There is also a sewer system, within the jurisdiction of the
sewer department, which transfers sewage from buildings
through pipes to a sewage treatment plant. No physical
connection exists between the sewer system and the water
drainage system above described. However, on Montello at
its junction with Franklin there is a dual-purpose manhole
(one of two of this kind among the manholes in the area):
the twelve-inch drainage pipe at that place appears on the
floor as an open trough; a sewer pipe, also open, lies three
feet above the floor. This sewer pipe connects with a sewer
line to the plaintiff's basement.[1]

On July 30, 1976, a downpour of 3.52 inches led to flood
conditions with the water rising above the street curbings
and flowing into the plaintiff's building over and through

---

[1] There was some question about the exact physical layout here, but any
difference between the parties is irrelevant to decision.

the foundation. At the same time the storm waters overflowed the open trough in the manhole and rose above the open sewer pipe, so that the drainage water and sewage could intermix. The pressure of the rising storm runoff caused the flow in the sewer line to reverse and back into the plaintiff's basement.

From the center line, east and west, of the black-topped municipal parking lot, surface water ran off north into Court, and south into Franklin, and thence eastward downhill into Montello, entering into the drainage system and exacerbating the flood.

Flooding of water including sewage content reached a depth of over two feet in the plaintiff's basement and the damage amounted in all to some $84,000.

The judge found that the drainage system had remained unchanged for many years except that, through the mid 1970's, the catch basin element suffered from deterioration and blockage; some catch basins had become inoperative for one reason or another. Dual-purpose manholes are now viewed as outmoded and new construction of that type is prohibited. A casualty befell the plaintiff earlier, in 1974, when after heavy rainfall the plaintiff's basement was flooded to a depth of three inches, with indications of sewer backup. The city had notice of this event.

2. *Sketch of the older law.* Key to the older law on municipal responsibility was the vague "underlying test" — "whether the act is for the common good of all without the element of special corporate benefit or pecuniary profit." *Morash & Sons, Inc.* v. *Commonwealth*, 363 Mass. 612, 621 (1973). If this condition was met, a municipality could not be held liable; if it was not met, there might be liability.

Originally, sewers were built and maintained privately.[2] Even after municipalities began constructing such systems,

---

[2] These early sewer systems were called "main drains or common sewers," terms still used in G. L. c. 83, § 1 (as amended through St. 1969, c. 758, § 7), authorizing municipalities to build sewers. Until the development of modern plumbing, the chief purpose of sewer systems was not to carry sewage in the modern sense, but to drain cellars and swampy

they were regarded as benefitting not the public at large, but particular property owners who were assessed much of the cost of construction; they were, indeed, spoken of as "commercial enterprise[s]." *Smith* v. *Gloucester*, 201 Mass. 329, 336 (1909). On this view the rule of immunity as to acts for the common good was not applied, and a contrary rule arose, that municipalities could be held liable for negligence in the construction and maintenance of sewers. *Morash*, 363 Mass. at 622. This type of fault, however, was distinguished from fault in the design of a system, where immunity still attached. See *Pevear* v. *Lynn*, 249 Mass. 486, 488 (1924); *Lobster Pot of Lowell, Inc.* v. *Lowell*, 333 Mass. 31, 33 (1955). The latter wrinkle appeared consistent with the idea that discretionary activities of government, as contrasted with the ministerial, should be free of civil liability.[3]

The attitude toward highway drainage systems was quite different. The State had long cast on municipalities the duty of keeping their public ways in good repair, whence followed a duty to deal with water drainage. See *Blaisdell* v. *Stoneham*, 229 Mass. 563, 565 (1918). Acts of the municipal officers in that connection, therefore, were chargeable to the State, not the municipality (and the State could not be held without its consent). In the course of time it ceased to make a difference whether the duty was imposed or undertaken voluntarily (cf. *Bolster* v. *Lawrence*, 225 Mass. 387, 389 [1917]), and little attention was paid to the status of the actor as a public officer. See *Whitney*, 373 Mass. at 215 n.8. The highway drainage rule could still stand, how-

---

land. See *Smith* v. *Gloucester*, 201 Mass. 329, 334-337 (1909). The rules of municipal liability as to sewer systems, as described herein, apply both to systems that carry what we now call "sewage" (as does the sewer system in the present case) and to those used to drain excess ground and surface water.

[3] Compare *Whitney*, 373 Mass. at 217, where the court uses the distinction in envisioning a rational scheme of civil responsibility for governmental acts. The distinction is crucial to the statute that was eventually adopted (see G. L. c. 258, §§ 2, 10[b]) as well as the Federal Tort Claims Act, 28 U.S.C. §§ 2674, 2680(a) (1976).

ever, on the proposition that the function was a "public" one, "from which is derived no special corporate advantage, no pecuniary profit, and no enforced contribution from individuals particularly benefitted by way of compensation for use or assessment for betterments." *Bolster*, at 389. It followed that a municipality could not be held liable for negligence even in the construction or maintenance of a highway drainage system. See *Smith* v. *Gloucester*, 201 Mass. at 334; *Blaisdell* v. *Stoneham*, 229 Mass. at 565; *Shea* v. *Lexington*, 290 Mass. 361, 369 (1935); *Lemasurier* v. *Pepperell*, 10 Mass. App. Ct. 96, 97 (1980).[4] But the cases also suggested that, where a highway drainage system was integrated with a larger ground or surface water drainage system (see note 2, *supra*), the sewer rules on municipal liability could be brought to bear. See *Westcott* v. *Boston*, 186 Mass. 540, 542 (1904).[5]

Athwart all this law, and in uneasy relation to it, was the doctrine that a municipality was liable for the consequences of a private nuisance on land owned by it, just as an ordinary owner might be held in similar circumstances. See *Morash*, 363 Mass. at 616; *Kurtigian* v. *Worcester*, 348 Mass. 284, 288 (1965).[6]

---

[4] There had long been a limited statutory liability for damages caused by negligent street repairs (G. L. c. 84, § 15), but that is not relevant here.

[5] In considering this issue of integration, courts have looked to such factors as the scope and elaborateness of the drainage system, whether it served functions other than highway drainage, whether it was built under authority granted by the "main drains or common sewers" statute, and whether the municipality was empowered to levy assessments against those benefitted. See *Emery* v. *Lowell*, 104 Mass. 13, 14-17 (1870); *Brayton* v. *Fall River*, 113 Mass. 218, 226-227 (1873); *Bates* v. *Westborough*, 151 Mass. 174, 183-184 (1890); *Smith* v. *Gloucester*, 201 Mass. at 334-336 (1909); *Arick* v. *Worcester*, 273 Mass. 134, 136, 139 (1930).

[6] Where a plaintiff's true grievance was negligent construction or maintenance of a highway drainage system, the case could not be improved by phrasing the claim as one in nuisance. *Lemasurier* v. *Pepperell*, 10 Mass. App. Ct. 96, 97 (1980).

3. *Rulings and application of law.* The judge grappled with the older law as described. Regarding the sewers he ruled that there was no evidence they were functioning improperly in a sense that would entail liability within the rule about negligent maintenance and so forth. For any fault in the plan of the system there would be immunity. He indicated also that in his view the proximate cause of the damage was the overflow of surface water at the manhole and not any problem with the sewer system.

By the conventional rule the city could not be held liable for damage resulting from the highway drainage system. The judge had nothing to say about possible liability on account of any claim that the highway drainage system was incorporated into a larger ground or surface water drainage system within the meaning of the cases mentioned above (see note 5, *supra*). He made no finding directed to that point, and the findings that were made would not warrant a conclusion favorable to the plaintiff.[7] There is no indication in the record before us that the plaintiff sought and was denied findings on the matter.

Coming to the nuisance phase of the case, the judge held that the city's parking lot, as constructed by the city after demolition of structures at that place, did not so affect artificially the flow of surface water as to qualify as a private nuisance, at least under the law as understood in the Com-

---

[7] The fact that two drainage pipes were called "main drains" (see note 2, *supra*) is not impressive. The plaintiff points out on the appeal that a highway drainage system was authorized to be built in Brockton under St. 1888, c. 309, which would allow for the construction of an extensive surface water drainage system and for the levying of assessments against benefitted property owners. We do not know what sort of surface water drainage system was in fact built, or whether the highway drainage system was ever part of any larger drainage system. Cf. *Anglim* v. *Brockton*, 278 Mass. 90, 98, 100 (1932), which is not indicative. If it were open to the plaintiff to argue the matter at this stage, the present record would have to be found insufficient to establish "integration."

monwealth before the announcement, by the concurring opinion in *Tucker* v. *Badoian,* 376 Mass. 907, 916-919 (1978), of a prospective new standard.[8]

We accept the substance of the judge's findings; there is, indeed, no material in this record by reference to which they could be held to be "clearly erroneous" (Mass.R.Civ.P. 52[a], 365 Mass. 816 [1974]). We may not invent new findings that could support a possible new theory. On the record presented, the decision below must be upheld.

*Judgment affirmed.*

---

[8] The judge had discretion to exclude as too remote a question on the part of the plaintiff bearing on the issue of nuisance. The judge remarked that the nuisance claim also failed because proof was not offered on the damages caused by that phase of the overflow.