Billings, Thomas P., J.
For the following reasons, the defendants’ Motion to Dismiss is ALLOWED.
FACTS
The Motion to Dismiss is brought under Rule 12(b)(6). The following facts, as alleged in the complaint and/or as apparent from the exhibits thereto, are therefore taken as true for present purposes.
The plaintiff, Barbara Johnson (“Johnson”), is a member of the Massachusetts bar. She is the respondent in several complaints before the defendant Board of Bar Overseers (“BBO”) which, at least indirectly, are the genesis of the present proceeding. She also maintains a website at falseallegations.com.
Defendant Daniel Crane (“Crane”) has been, at all material times, the Bar Counsel for Massachusetts. Defendant Susan Strauss-Weisberg (“StraussWeisberg”) has been an Assistant Bar Counsel.
Johnson ran for governor unsuccessfully, in 2002, on a platform of court reform and the abolishment of judicial and quasi-judicial immunities. On January 24, 2003 the OBC filed a petition for discipline against her at the BBO, with (the Complaint alleges) the intention of interfering with her livelihood and intimidating her from using her website to criticize the judiciary. The three-count petition was based on the aforementioned four complaints.[1]
The Complaint further alleges that the defendants are responsible for four separate defamatory communications, as follows.
1. BBO Website
The BBO maintains a website on which members of the public can look up the status of any attorney licensed in Massachusetts. On or about the date the petition for discipline was filed the BBO added the notation, on the record pertaining to Johnson, “Disciplinary Proceedings Pending.”
2. Boston Herald, March 2003
In the first week of March 2003 the Boston Herald ran an article headlined, “Bar better be prepared for battle.” The story covered the petition for discipline, and led off with a quote from Johnson:
*321 The bar is a kangaroo court, and I want it spread wide open from sea to sea. I campaigned on a platform of court reform. I should be concerned about it, but I’m not. I suffer no guilt and no remorse. Their goal is to discredit me so I won’t be listened to.
The article then noted that the petition contained allegations including “posting confidential information about clients on her Web site [and] commingling client funds.” It inquired:
Did she really, as assistant bar counsel Susan Strauss-Weisberg claims, post “highly sensitive” information on her Web site— "falseallegations.com" — about a child in a paternity action in which Johnson represented a father who was accused of sexually abusing the boy?
According to Weisberg, the information included “particulars of the boy’s evaluation and therapy... the therapists’ finding concerning the abuse and ensuing trauma.”
After reporting Johnson’s qualified denial,[2] the article continued with “Weisberg’s view” that “it was wrong” and that “the only ‘substantial purpose’ Johnson had in posting the photos [of the child; see fn. 1] was to ‘embarrass or burden’ the boy and his mother.” The article also attributed to Strauss-Weisberg the statement “that Johnson spent part of a $10,000 client retainer on her own personal expenses.”
3. Lawrence Eagle-Tribune, December 19, 2003
A hearing on the petition for discipline was scheduled for December 2, 2003, and apparently commenced that day. On December 19,2003 the Lawrence Eagle-Tribune ran a story headlined, “Bar counsel cracks down on Andover lawyer.” This quoted Crane as saying that “he expects the Office of Bar Counsel to announce Johnson’s fate within two to four months,” and then quoted Johnson as saying she was “convinced she will be disbarred. ‘I expect they will revoke my license quickly,’ Johnson said yesterday. They can’t wait to get rid of me.’ ”
The article went on to report that the hearing, originally scheduled for three days,
began and ended December 2, shortly after [Johnson] began her opening statement. The proceedings were closed to the public, and Johnson’s supporters and witnesses were ordered to leave after Johnson repeatedly mentioned the names of children and others whose identities were protected by law, despite numerous warnings to stop, Crane said.
The article does not always explicitly attribute its information to particular sources, but the Complaint alleges that Crane was the source for the following, in addition to the statements just quoted:
That the OBC “was seeking a disciplinary hearing stemming from complaints from two of Johnson’s former clients.”
That Johnson had “said mentioning the names of the ‘protected’ individuals was ‘a slip of the tongue.’ ”
That Johnson “later posted on her Web site the names of the people she mentioned at the hearing, at least one of whom was under the protection of a court order.”
That “Johnson published confidential information about the ex-wife of a client accused of sexually and physically abusing his young son. The information was posted on the Internet to ‘embarrass or burden’ the boy’s mother, who was at the time running for public office in Bristol County, the complaint alleges.”
That “the complaint further alleges Johnson withheld $7,575 from a client without securing a signed fee agreement," and that after “her client complained to the Bar about the bill, Johnson posted confidential information about the case on her Web site.”
4. Certificate of Good Standing
On March 14, 2005 Johnson applied to the SJC for a Certificate of Good Standing, and to the BBO for a clearance letter, all in furtherance of Johnson’s application for admission pro hac vice in a court proceeding in another state. When the SJC issued the certificate on March 21, it included a notation, “Open disciplinary grievances pending,” with ten docket numbers listed, and also: “A public proceeding against her is currently pending before a special hearing officer.” Four of the docket numbers corresponded to those that had led to the petition for discipline. The BBO had notified Johnson of three others; of the remaining three, she had no notice. The information concerning the ten grievances came from the clearance letter, which Strauss-Weisberg prepared and Crane approved.
Johnson left a voicemail message for StraussWeisberg, asking for details concerning the open grievances. Strauss-Weisberg responded in a letter to Johnson, marked “Personal and Confidential,” confirming that four of the grievances were the subject of the petition for discipline, and that the remaining six were “in ‘held’ status in which no action has been taken in light of the current disciplinary proceedings.” For each of these, the letter identified the source of the grievance (one client complaint, four referrals by judges, and one file opened in response to a published opinion of the Appeals Court in a case in which Johnson was the defendant/appellant). As to three, Strauss-Weisberg noted that the OBC had determined that no response from Johnson was required as yet (and so, apparently, had not notified her of them).
On April 4, 2005 Johnson wrote to the Clerk of the SJC to request a new letter that did not reference to the BBO complaints, on the grounds (a) that the complaints were politically motivated and (in some *322 cases) had not been investigated by the OBC or the BBO, and (2) that “[pjarticularly where the form [on which the certificate is printed] states that private reprimands are not covered by the certification, certainly uninvestigated complaints also must not be covered by it.” The SJC refused to issue a new certificate without the docket numbers, thus “both violating Johnson’s right to equal protection [and] also defaming her,” and also interfering with her advantageous or contractual business relations with a client. Johnson was not admitted pro hac vice in the out-of-state proceeding, and thus was deprived of a paying client.
On the basis of the foregoing allegations, the Complaint pleads the following claims:
Count 1: Defamation by the Commonwealth, the BBO, and the OBC (publication on the BBO website).
Count 2: Defamation by Strauss-Weisberg (statements republished in the Boston Herald).
Count 3: Defamation by Crane (statements republished in the Lawrence Eagle-Tribune).
Count 4: Defamation by the Commonwealth, Crane, Strauss-Weisberg, the BBO, and the OBC (Clearance Letter and Certificate of Good Standing).
Count 5: Intentional Interference with Prospective Advantageous Business Relations with a Client by the Commonwealth, Crane, Strauss-Weisberg, the BBO, and the OBC (Clearance Letter and Certificate of Good Standing).
The defendants, moving to dismiss the Complaint for failure to state a claim upon which relief may be granted, assert various immunity defenses, discussed below. They also invite judicial notice of the decision in Johnson v. Board of Bar Overseers of Massachusetts et al., 324 F.Sup. 276 (D.Mass. 2004). The facts underlying the federal case overlap with, and in two instances replicate,[3] those pleaded in this case.
In his reported decision, Chief Judge Young held that the Younger[4] abstention doctrine precluded the federal court from granting the requested declaratory relief regarding Johnson’s BBO proceeding. With regard to the claims for damages, the court held that the Commonwealth, state agencies, and the individual defendants sued in their official capacities were immune from suit by virtue of the Eleventh Amendment to the United States Constitution, and that to the extent sued individually, the individual defendants enjoyed quasi-judicial or quasi-prosecutorial immunity under the case law decided under 42 U.S.C. § 1983. Finally, having dismissed all of the federal claims, the court declined to exercise pendent jurisdiction over the state-law defamation claims, and so dismissed the case.
DISCUSSION
Not having reached Johnson’s state law claims, the federal court decision leaves for this Court the determination of whether the defendants, any or all, are immune from suit. They assert that they are all immune, on the following grounds:
1. That SJC Rule 4:01, §9(3) explicitly provides that the BBO, the OCB, and their employees “shall be immune from liability for any conduct in the course of their official duties”;
2. That even apart from the rule, Crane and Strauss-Weisberg would enjoy absolute common-law prosecutorial immunity; and
3. That the Commonwealth, the BBO, and the OCB are immune from suit under G.L.c. 258, §10(c).
These three arguments are considered here somewhat out of order.
A. Prosecutorial Immunity
Massachusetts law affords absolute immunity to prosecutors for acts taken “in the discharge of their official duties.” The doctrine embodies “a tradition of judicial and prosecutorial immunity rooted in history and based upon sound considerations of public policy.” Chicopee Lions Club v. District Attorney for the Hampden Dist., 396 Mass. 244, 252 (1985).
The same policy considerations supporting an absolute immunity for judges under Massachusetts common law . . . justify a similar protection for public prosecutors. “The public interest requires that persons occupying such important positions as did these defendants and being so closely identified with the judicial department of the government should not be liable to private suits for what they do in the discharge of their official duties, and such officers are entitled to the protection that the law gives them, not because of concern for their personal immunity, but because such immunity tends to insure zealous and fearless administration of the law.
Id. at 251, quoting Andersen v. Bishop, 304 Mass. 396, 400 (1939).
The court in Chicopee Lions Club held that a prosecutor was not liable in damages for having threatened to have the state police raid a “Monte Carlo Night” planned by the Club as a fundraiser, causing the event’s cancellation. In so holding, the court found it unnecessary to decide whether to adopt the “functional” approach of the federal courts to prosecutorial immunity, being content with the observation “that the scope of prosecutorial immunity under State common law and under [the Massachusetts Civil Rights Act] is at least as broad as under [42 U.S.C.] §1983.”
The “functional analysis” employed by the federal courts distinguishes between “quasi-judicial” activities that are “closely related to the judicial phase of a criminal proceeding, or involve! ] the skills or judgment of an advocate” (as to which the prosecutor is absolutely immune from suit), versus cases in which “the challenged conduct is beyond the realm of trial preparation and involves the prosecutor in roles other than that of an advocate,” as to which “the conduct is *323 protected only by a qualified immunity.” 396 Mass. at 248-49 (citations omitted). Using this approach, the U.S. Supreme Court has held that a prosecutor was not absolutely immune from liability in a Section 1983 suit alleging that he had made false statements at a press conference announcing the return of an indictment. Buckley v. Fitzsimmons, 509 U.S. 259, 276-78 (1993). Although comments to the media “may be an integral part of a prosecutor’s job, and they may serve a vital public function,” the court noted, they “have no functional tie to the judicial process just because they are made by a prosecutor”; therefore, they merit only qualified immunity. Id. at 277-78 (citation omitted).
The Chicopee Lions Club holding, conferring immunity on a district attorney for conduct in a case where no crime had yet been committed, arguably bespeaks a broader notion of prosecutorial immunity than is applied in the federal cases, perhaps including Buckley v. Fitzsimmons. Whether or not the Massachusetts conception of prosecutorial immunity would apply to statements made to the press concerning a pending proceeding, and if so, whether it would extend to the accusatory arm of an administrative body, need not be resolved here,[5] however, because as it happens, the SJC has spoken explicitly on these subjects as they relate to the BBO, the OCB, and their employees.
B. SJC Rule 4:01, §9(3)
The BBO and the OBC are constituted and governed by Chapter Four of the Rules of the Supreme Judicial Court; specifically, sections 5 and 7, respectively, of SJC Rule 4:01. Section 9 of the same Rule addresses immunities; subsection (3) provides as follows:
The Board, members of the Board and its staff, members of hearing committees, special hearing officers, and the bar counsel and members of his or her staff shall be immune for any conduct in the course of their official duties.
The Rule is plain.and unambiguous. It contains no hint of a “functional analysis,” or of any other qualification on the immunity conferred on the entities and persons named, save only that the challenged conduct must have been committed “in the course of their official duties.”
The Complaint neither makes, nor leaves any room for, the suggestion that the BBO, the OBC, Crane, or Strauss-Weisberg acted outside the scope of their official duties with respect to any of the conduct alleged.
The general respondeat superior test involving intentional torts considers whether the act was within the course of employment, and in furtherance of the employer’s work. The scope of an employee’s employment is not construed restrictively . . . “[A] servant is authorized to do anything which is reasonably regarded as incidental to the work specifically directed or which is usually done in connection with such work.”
Howard v. Burlington, 399 Mass. 588, 590-91 (1987) (citations omitted). The complaint must therefore be dismissed as against these defendants.
C. Chapter 258
The liability of the Commonwealth in tort is governed by the Massachusetts Tort Claims Act, Chapter 258 of the General Laws. In section 10(c), the Act provides that its provisions shall not apply to “any claim arising out of an intentional tort, including . . . libel, slander, . . . interference with advantageous relations or interference with contractual relations.”
No reported case has considered whether the BBO or the OBC is a “public employer.” Johnson maintains that they are not,[6] and her Complaint eschews any claim that the Commonwealth is derivatively liable for the actions of these entities or their employees. Instead, the Complaint alleges that the Commonwealth is liable (a) because it lent its website for use by the BBO, including the attorney “lookup” function and the page pertaining to Johnson that mentioned her pending disciplinary proceeding, and (b) for the actions of the SJC in including reference to Johnson’s BBO proceedings on its Certificate of Good Standing, and then refusing her request for a sanitized certificate.
Both of these actions, and the defamation and intentional interference claims that flow from them, fall squarely within the section 10(c) exemption for intentional torts. Johnson argues, however, that Article v. of the Massachusetts Constitution,[7] which provides that public officials are the “substitutes and agents” of the people, from whom official power is derived, and “are at all times accountable to them” renders all common-law immunities, and all limitations on liability under and the Tort Claims Act, unconstitutional.
One has the sense that equating “accountable” with “liable in damages, without qualification” would have grated on the eighteenth century ear at least as much as on the modem one. In any event, the argument reads far more into Article v. than any reported case brought to my attention, and ignores the long line of cases upholding — and discussing the respectable antiquity of — the judicial, prosecutorial, and sovereign immunities. See, as to judicial and prosecutorial immunity, Anderson v. Bishop, 304 Mass. 396 (1939), and cases cited at 398-99, particularly Allard v. Estes, 292 Mass. 187, 189-90 (1935), and as to sovereign immunity, Morash & Sons, Inc. v. Commonwealth, 363 Mass. 612, 618-19 (1973).
To be sure, in Morash & Sons and, four years later, in Whitney v. Worcester, 373 Mass. 208 (1977), the SJC criticized the doctrine of blanket sovereign immunity in tort, and urged legislative action to waive immunity in appropriate cases. The court stressed that sovereign immunity is a judge-made doctrine and could be judicially abolished, but that “[a] legislative *324 approach is preferable.” Morash & Sons, 363 Mass. at 624.
Nowhere in either opinion did the court suggest, however, that this or other governmental immunities were unconstitutional. It did state that whatever the merits and demerits of blanket immunity, “[c]learly, there should be limits to governmental liability and exceptions to the rule of liability, based upon considerations of justice and public policy . . . [T]he need for limits on the liability of governmental units is generally recognized, even where immunity is judicially abrogated.” Id. at 623.
The legislative action suggested by the SJC was taken in 1978, with the passage of the Massachusetts Tort Claims Act. As the Morash & Sons opinion anticipated, the Act incorporates a number of policy-based limits on governmental liability, including section 10(c)’s exemption for intentional torts. No reported case has suggested that these provisions offend the Constitution, and I hold that they do not. The Commonwealth, therefore, like the other defendants, is immune from liability for the conduct alleged against it in this case.
ORDER
For the foregoing reasons, the defendants’ Motion to Dismiss is ALLOWED. Judgment to enter, dismissing the Complaint.

It bears noting here that once Bar Counsel filed a petition for discipline, the proceedings became public. S.J.C. Rule 4:01, §20.

Johnson is quoted in the article as saying, “It’s a complete lie, and I defy anyone to prove that.” This is followed, however, with her admission that she had posted information about the case on her website, which included her statement that the mother was a perjurer who had falsely accused the father of sexual abuse, as well as photographs of the boy.

As described in the district court’s decision, the complaint in that court asserted: “six Counts seeking declaratory judgments that various rules and procedures of the Board of Bar Overseers are unconstitutional (Counts 1-6), two Counts for violation of her civil rights under 42 U.S.C. §1983 (Count 7) and (Count 9), one Count for conspiracy to violate her civil rights under 42 U.S.C. §1985(3) (Count 8), and one count of defamation under state law (Count 10). Much of the relief sought was declaratory in nature. ’’Additionally," however, “Johnson seeks money damages from Bar Counsel for making allegedly defamatory statements about her to a reporter that were subsequently published in a local newspaper, as well as money damages from the Board of Bar Overseers for posting on its website that disciplinary proceedings are pending against her.” 324 F.Sup.2d at 281 (citations to paragraphs in Complaint omitted).

See Younger v. Harris, 401 U.S. 37 (1971) (federal courts may not intervene in ongoing state criminal proceedings), and Middlesex County Ethics Committee v. Garden State Bar Ass'n, 457 U.S. 423 (1982) (applying Younger to bar disciplinary proceedings).

Nor is it necessary to decide whether, if the functional approach were followed, the more ministerial actions alleged against various of the defendants — the notation on the BBO website that Johnson had a pending disciplinary proceeding, and the reporting of these proceedings to the SJC in the clearance letter — would fall within or outside the privilege.

Her argument finds support in the statute itself, and the caselaw under it. See c. 258, §1 (Act does not apply to “any . . . independent body politic and corporate”); Karlin v. Massachusetts Turnpike Auth., 399 Mass. 765, 766-67 (1987) (noting that “(a]s an independent entity, supported by its own nontax revenue sources and without the Commonwealth’s credit pledged on its behalf, the Authority’s circumstances do not present the need for the protection of public funds which underlay the reason for governmental immunity.” The BBO and the OBC are likewise supported by nontax revenues; in their case, attorney dues.

“A11 power residing originally in the people, and being derived from them, the several magistrates and officers of government, vested with authority, whether legislative, executive, or judicial, are their substitutes and agents, and are at all times accountable to them.”