NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11801


   WALTER E. FERNALD CORPORATION  vs.  THE GOVERNOR & others.[1]



        Suffolk.      February 5, 2015. - May 29, 2015.

   Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
                    & Hines, JJ.



Corporation, Charitable corporation.  Real Property, Ownership.
     Governmental Immunity.  Agency, Public agent.




     Civil action commenced in the Land Court Department on
September 8, 2010.

     The case was heard by Keith C. Long, J., on a motion for
summary judgment.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     Joseph Callanan, Assistant Attorney General (John M.
Donnelly, Assistant Attorney General, with him) for the
defendants.
     Thomas J. Frain (C. Alex Hahn with him) for the plaintiff.


     LENK, J.  The Walter E. Fernald Corporation (corporation),

_____

     [1] Department of Developmental Services and Division of
Capital Asset Management.

established in 1850, is a charitable organization devoted to serving the needs of the developmentally disabled. The corporation brought an action in the Land Court, seeking, among other things, a declaration under G. L. c. 231A, § 1 (declaratory judgment act), that it is the owner of certain parcels of recorded land. The parcels are located on Norcross Hill in Templeton (Templeton parcels). As defendants in its suit, the corporation named the Governor, the Department of Developmental Services, and the Division of Capital Asset Management (collectively, the Commonwealth); the Commonwealth had asserted ownership of the Templeton parcels by, among other things, naming several of them in a statute designating an expanse of land for conservation and public recreational purposes. See St. 2002, c. 504.

A judge of the Land Court denied the Commonwealth's motion to dismiss the corporation's suit on grounds of sovereign immunity. Subsequently, the judge allowed the corporation's motion for summary judgment. The judge concluded that there could be no genuine dispute that, although a school established by the corporation became an agency of the Commonwealth in the early Twentieth Century, the corporation itself remained independent of the Commonwealth, and purchased the Templeton parcels on its own behalf. The judge therefore entered judgment declaring the corporation's ownership of the parcels.

We affirm, holding that sovereign immunity does not apply to the particular type of action brought here and adopting the same analysis of the facts taken by the judge below.

1.  Background.  We outline the facts that gave rise to this litigation, reserving the details for later discussion.

The corporation was created by a special act of the Legislature, at a time when no general framework had been enacted for the establishment of corporations.[2]  See St. 1850, c. 150.  The incorporating statute gave the corporation the name, unfortunate by today's lights, "the Massachusetts School for Idiotic and Feeble-minded Youth."  St. 1850, c. 150, § 1. As soon as it was created, the corporation established a school, also named "the Massachusetts School for Idiotic and Feeble-minded Youth" (school).  In addition, the corporation devoted resources to conducting and publishing research.

Over the years, the corporation changed its name several times.  In 1883, as the school began to accept adults as well as children, the corporation took the name "the Massachusetts School for the Feeble-Minded."  Other name changes were made in 1925 ("the Walter E. Fernald State School") and 1987 ("the Walter E. Fernald State School Corporation").  The corporation assumed its current name ("the Walter E. Fernald Corporation")

---

[2] See Larcom v. Olin, 160 Mass. 102, 104 (1893) (discussing subsequent enactment of St. 1851, c. 133).

in 2006.  Walter E. Fernald, for whom the corporation eventually was named, served as the school's longtime superintendent in the early Twentieth Century.

From the start, the Commonwealth made appropriations to help support the school, both annually and for specific purposes.  See, e.g., Resolves 1851, c. 44; St. 1901, c. 303. In several instances, the Commonwealth provided funding to purchase land for the school.  See Resolves 1887, c. 64; Resolves 1897, c. 64.  The corporation purchased the Templeton parcels with its own money, in a series of transactions conducted between 1923 and 1969.  This land was used by the school at various times, particularly for farming.

In 2002, the Legislature enacted a statute designating enumerated parcels of land for "conservation and public recreational purposes."  St. 2002, c. 504.  Five of the six Templeton parcels were included among those listed in the statute.[3]  The corporation brought an action in the Land Court, seeking, among other things, a declaration that the Templeton parcels are owned by the corporation.

Portions of the corporation's complaint were dismissed by a Land Court judge in an order issued on February 14, 2011.  The

---

[3] Although the sixth parcel was not listed in St. 2002, c. 504, the Walter E. Fernald Corporation (corporation) included it in its complaint "out of an abundance of caution."

judge determined, in that decision, that the Governor was not a necessary or proper party, and that the relief sought by the corporation other than declaratory relief was not within the Land Court's jurisdiction. The judge did not, however, agree with the Commonwealth that the corporation's suit was barred altogether by the doctrine of sovereign immunity.

The corporation moved for summary judgment on the balance of its complaint. In another order, issued on December 27, 2013, the Land Court judge allowed the motion and declared the corporation's ownership of the parcels, free of any claims by the Commonwealth. The Commonwealth appealed, arguing that the judge erred both in his rejection of the Commonwealth's sovereign immunity defense and in his resolution of the merits. We transferred the appeal to this court on our own motion.

2. Standard of review. We review a grant of summary judgment de novo. See Federal Nat'l Mtge. Ass'n v. Hendricks, 463 Mass. 635, 637 (2012). We "need not rely on the rationale cited and 'may consider any ground supporting the judgment.'" District Attorney for N. Dist. v. School Comm. of Wayland, 455 Mass. 561, 566 (2009), quoting Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991). Summary judgment is appropriate if, viewed "in the light most favorable to the nonmoving party," Fuller v. First Fin. Ins. Co., 448 Mass. 1, 5 (2006), the materials properly in the summary judgment record "show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002).

3. Sovereign immunity. The doctrine of sovereign immunity provides that the Commonwealth "cannot be impleaded into its own courts except with its consent." Randall v. Haddad, 468 Mass. 347, 354 (2014) (Randall), quoting Woodbridge v. Worcester State Hosp., 384 Mass. 38, 42 (1981). Such consent may be provided "by statute"; it also may be "implicit[], where 'governmental liability is necessary to effectuate the legislative purpose.'" Woodward Sch. For Girls, Inc. v. Quincy, 469 Mass. 151, 177 (2014), quoting Todino v. Wellfleet, 448 Mass. 234, 238 (2007). The doctrine applies "both to money judgments and more generally to 'interference by the court at the behest of litigants.'" Boxford v. Massachusetts Highway Dep't, 458 Mass. 596, 601 (2010), quoting New Hampshire Ins. Guar. Ass'n v. Markem Corp., 424 Mass. 344, 351 (1997).

Sovereign immunity originated in the ancient notion that "[t]he king can do no wrong." J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 793 (1986). Scholars have for many years "suggested that the doctrine is an anachronism in American law," given our nation's rejection of the monarchy. See Morash & Sons, Inc. v. Commonwealth, 363 Mass. 612, 618 (1973) (Morash & Sons), citing K.C. Davis, 3 Administrative Law § 25.01, at 435

(1958). Many courts and legislatures have agreed; "[t]he courts in some jurisdictions have abolished the doctrine of governmental immunity entirely," and "[a]ll other jurisdictions have eroded the immunity by both statutory exceptions and judge made exceptions." Morash & Sons, supra at 618-619, and cases cited. See H.J. Alperin, Summary of Basic Law § 17.132, at 870 (4th ed. 2009).

Our own view has been that "there should be limits to governmental liability and exceptions to the rule of liability." Morash & Sons, 363 Mass. at 623. Yet we also have recognized that an overly comprehensive rule of sovereign immunity is "unjust and indefensible as a matter of logic and sound public policy." Whitney v. Worcester, 373 Mass. 208, 209 (1977) (Whitney). We have explained that sovereign immunity creates an "inversion of the law," shielding the government from liability for wrongs that ordinarily would be redressed. See Morash & Sons, supra at 621. Although this "inversion of the law," id., is financially beneficial to the general public, "it can hardly be termed sound public policy that some persons contribute only tax revenues to the commonweal while from others additional contribution is exacted in the form of uncompensated injuries." Whitney, supra at 215.

We have "long recognized that 'sovereign immunity is a judicially created common law concept,' . . . and, as such, is

subject to judicial abrogation or limitation." Randall, 468 Mass. at 356, quoting Morash & Sons, 363 Mass. at 615, and citing Whitney, 373 Mass. at 212. In 1977, we announced our intention to abrogate sovereign immunity in tort cases. See Whitney, supra at 210. Soon thereafter, the Legislature enacted the Tort Claims Act, G. L. c. 258, which permits recovery, subject to certain exceptions and limitations, for torts committed by the Commonwealth, its subdivisions, and its agents. No similar legislative action was needed with regard to actions in contract, since the law has long been settled that "a State consents to jurisdiction by voluntarily entering into a contract." J.A. Sullivan Corp. v. Commonwealth, 397 Mass. at 793.

Sovereign immunity remains in place in other areas of the law. See Randall, 468 Mass. at 357. We have identified three "reasons of justice and public policy" (citation and quotation omitted), id. at 358-359, that, in some contexts, support continued application of the doctrine: sovereign immunity may serve "to protect the discretionary functions of a public official, . . . or to prevent the unauthorized actions of a public official, . . . or to shield the public fisc from the specter of virtually unlimited liability" (citations omitted). Id., quoting Bates v. Director of the Office of Campaign & Political Fin., 436 Mass. 144, 174 (2002) (Bates). We have

indicated our reluctance to apply the sovereign immunity doctrine where it would not serve these goals. See Randall, supra at 358-359 (purposes of sovereign immunity not served where, in violation of court order, public employee deposited funds in State retirement account); Bates, supra (purposes not served where Legislature failed to appropriate funds to effect law enacted by ballot measure). See also Morash & Sons, 363 Mass. at 619.

The Commonwealth's argument that the surviving portion of the corporation's complaint is barred by sovereign immunity rests largely on our one-half century old decision in Executive Air Serv., Inc. v. Division of Fisheries & Game, 342 Mass. 356 (1961) (Executive Air). There, the Commonwealth purchased two parcels of registered land and obtained certificates of title from the Land Court. Id. at 357. The Commonwealth's deeds were subject to leases held by the plaintiff, which operated an airport on the land. Id. The plaintiff sought a declaratory judgment invalidating the Commonwealth's deeds and certificates of title. Id. The theory put forth by the plaintiff, so far as our brief opinion reveals, was that the enactment of the declaratory judgment act ended the Commonwealth's immunity as to any suit brought under that act. See id. at 358. We rejected that view, stating that the declaratory judgment act "relates to procedure," and that, as other jurisdictions have held,

"sovereign immunity is not affected by declaratory judgment procedure."  Id. at 357-358.

We since have reiterated that the Legislature did not intend to waive sovereign immunity for the universe of actions brought under the declaratory judgment act.  See, e.g., Sullivan v. Chief Justice for Admin. & Mgmt. of the Trial Court, 448 Mass. 15, 24 (2006) (declaratory judgment act "includes only a limited waiver of sovereign immunity").  See also Fathers & Families, Inc. v. Chief Justice for Admin. & Mgmt. of the Trial Court, 460 Mass. 508, 509-510 (2011) (judicial department is not subject to declaratory judgment procedure).  That is to say, we have continued to maintain that a plaintiff cannot sidestep the common-law shield of sovereign immunity, to the extent that that shield remains intact, by using the procedural device of an action for declaratory judgment.

We now hold, however, that our common-law sovereign immunity doctrine does not reach the specific type of suit at issue here, namely, one in which a plaintiff asserts its own ownership of specified parcels of recorded land.[4]  This brand of suit differs in two important ways from the one addressed in

---

[4] As discussed infra, if a plaintiff seeking to vindicate its ownership of recorded land were to initiate land registration proceedings, those proceedings would in any event bind the Commonwealth.  See G. L. c. 185, § 45 (judgment of registration "shall be conclusive upon and against all persons, including the [C]ommonwealth").

Executive Air: the plaintiff here asserts its own ownership of the land, rather than the ownership of a third party, and the land at issue here is not registered to the Commonwealth. See Executive Air, 342 Mass. at 357. We do not now reexamine our conclusion in Executive Air that the suit brought there was barred by sovereign immunity.

Our reasons for holding that sovereign immunity does not encompass actions by which a plaintiff seeks to vindicate its ownership of specified parcels of recorded land are the following. First and foremost, actions of this type do not implicate the concerns that support the continued application of sovereign immunity. Disputes concerning a plaintiff's ownership of specified parcels of recorded land do not tend to concern "the discretionary functions of a public official." Randall, 468 Mass. at 358, quoting Bates, 436 Mass. at 174. In other words, these actions are unlikely to be rooted in conduct "characterized by the high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning," Whitney, 373 Mass. at 218, where judicial inquiry "might 'jeopardiz(e) the quality and efficiency of government itself.'" Id., quoting Spencer v. General Hosp., 425 F.2d 479, 481 (D.C. Cir. 1969).

These types of actions also do not typically stem from "unauthorized actions of a public official," Randall, 468 Mass.

at 358, quoting Bates, 436 Mass. at 174, namely, attempts to circumvent the ordinary procedures by which the Commonwealth expends its funds. See George A. Fuller Co. v. Commonwealth, 303 Mass. 216, 119-220, 222-224 (1939) (sovereign immunity successfully asserted to bar building contractor's suit for payment approved ultra vires by emergency public works commission). And the adjudication of a plaintiff's ownership of specified parcels of recorded land would not subject the public fisc to a "specter of virtually unlimited liability." Randall, supra, quoting Bates, supra. The Commonwealth's potential liability in such cases is, rather, limited to losing control of properties that it does not truly own. In sum, in the words of the Supreme Judicial Court of Maine, the type of action we consider here "implicates none of the modern day considerations that would justify the State's invocation of sovereign immunity." Welch v. State, 853 A.2d 214, 216 (Me. 2004).

As in Randall, 468 Mass. at 356 n.21, we need not decide here whether our common-law doctrine of sovereign immunity is unconstitutional, in whole or in part. Nevertheless, in drawing the boundaries of that doctrine, we recognize that it strains against constitutionally protected values. Article 1 of the Massachusetts Declaration of Rights protects "the right of . . . acquiring, possessing and protecting property." The Declaration of Rights provides also that the "officers of government . . .

are at all times accountable to [the people]," art. 5, and that "[e]very subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character," art. 11.  Sovereign immunity diminishes the degree to which our laws protect property rights, provide recourse to legal proceedings, and hold government officers accountable to the people.[5]  See Welch v. State, 853 A.2d at 217 (constitutional protections of property and due process "would lose considerable meaning if the doctrine of sovereign immunity prohibited the people from bringing quiet title actions to settle ownership disputes with the State"); GAR Assocs. III, L.P. v. State ex rel. Texas Dep't of Transp., 224 S.W.3d 395, 401 (Tex. App. 2006) (inferring waiver of sovereign immunity from takings provision of Texas Constitution).

The Commonwealth suggests that its claim to sovereign immunity in the present circumstances is supported by Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273 (1983) (Block), a case concerning a land dispute between a State and the Federal government.  Under the Federal Quiet Title Act

---

[5] As a matter of degree, this is true in the current context even though, as discussed infra, a plaintiff engaged in a dispute with the Commonwealth over recorded land could turn also to the relatively onerous process of land registration.  See note 4, supra.

of 1972, 28 U.S.C. § 2409a (2012), actions to quiet title against the United States are subject to various restrictions, including a twelve-year statute of limitation. See 28 U.S.C. § 2409a(g) (2012). The United States Supreme Court held in Block, supra at 281, 284-285, that a plaintiff cannot circumvent this limitation by directing its suit against Federal officials rather than the Federal government. The Commonwealth points out that the process of land registration, under G. L. c. 185, §§ 26-45, binds the Commonwealth. See G. L. c. 185, § 45. Proposing an analogy to Block, supra, the Commonwealth asserts that "the availability of a land registration action reinforces the conclusion that the Commonwealth is immune from [declaratory judgment act] claims." This argument admits of at least two readings, neither of which persuades us that it would be appropriate for sovereign immunity to apply here.

First, the Commonwealth may be asserting that the Legislature did not endeavor, in the declaratory judgment act or the land registration statute, to waive its common-law sovereign immunity in cases like the current one. This premise does not, however, compel the conclusion that sovereign immunity bars the corporation's suit, because we have long disclaimed the notion that the Commonwealth "cannot be sued without legislative consent." Morash & Sons, 363 Mass. at 619. To the contrary, as we have explained both here and previously, because sovereign

immunity is "a judicially created common law concept," it is subject to judicial limitations of the kind we describe today. See Randall, 468 Mass. at 356, quoting Morash & Sons, supra at 615. See also Bates, 436 Mass. at 173 n.33; Whitney, 373 Mass. at 212.

Alternatively, the Commonwealth may be suggesting that, by enacting the land registration statute, the Legislature replaced common-law sovereign immunity with a statutory scheme that funnels all land disputes involving the Commonwealth to land registration proceedings. In this vein, in Block, 461 U.S. at 285-286, the United States Supreme Court described the Federal Quiet Title Act as "a precisely drawn, detailed statute" intended by Congress "to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." We do not think that our land registration statute likewise seeks to "preempt[] more general remedies." See id. at 285. The Quiet Title Act was created specifically for the purpose of defining the parameters within which actions for title to land may be brought against the United States. See id. at 282-284. By contrast, "[t]he intent of [our land registration] statute was to simplify land transfer and to provide bona fide purchasers with conclusiveness of title." Kozdras v. Land/Vest Properties, Inc., 382 Mass. 34, 43 (1980). The rule that a judgment of registration "shall be conclusive

upon and against all persons, including the [C]ommonwealth, whether mentioned by name in the complaint, notice or citation, or included in the general description 'to all whom it may concern,'" G. L. c. 185, § 45, is one among myriad provisions devoted to achieving conclusiveness of title.  We discern no indication that this provision was intended to displace our traditional doctrine of common-law sovereign immunity.  This second version of the Commonwealth's argument by analogy from Block, supra, is therefore equally unavailing.

Having concluded that sovereign immunity should not bar actions in which a plaintiff asserts ownership of specified parcels of recorded land, we are not constrained to defer "judicial action . . . to provide an inducement to the Legislature to abrogate the immunity on its own."  See Randall, 468 Mass. at 358, quoting Bates, 436 Mass. at 174.  It is true that, as discussed supra, we refrained for a time from abrogating sovereign immunity in the tort law setting, even after we had determined that the existing doctrine was "indefensible."  See Morash & Sons, 363 Mass. at 619.  But the jurisprudential shift that we anticipated in that context was complex in its doctrinal detail and far-reaching in its practical effect.  Consequently, we reasoned that "comprehensive legislative action was preferable to judicial abrogation followed by an attenuated process of defining the limits of

governmental liability through case by case adjudication." See Whitney, 373 Mass. at 209, and cases cited. By contrast, where we have held only that sovereign immunity does not reach a narrow, well-defined type of suit, we have applied those holdings without delay. See Randall, supra; Bates, supra; Morash & Sons, supra. We follow the same course today.

4. Ownership of the parcels. We thus arrive at the merits. As mentioned, the Templeton parcels were purchased by the corporation in a series of transactions between 1923 and 1969. The Commonwealth argues that, by the time of these transactions, the corporation had become a State agency. The Commonwealth itself obtained title to the parcels, in its view, by virtue of St. 1980, c. 579, § 10, which transferred "[t]itle to real property held in the name of a state agency . . . to the name of [the C]ommonwealth." The Land Court judge disagreed, determining, based on facts not in genuine dispute, that the corporation had at all times remained an entity separate from the Commonwealth.

The history of the corporation and the school that it founded is not easy to parse. As the Commonwealth has conceded, the corporation and the school came into being separately from each other. But the school was essentially the corporation's raison d'être for many years; it was only natural, therefore, that the corporation's reports and other records did not in

every instance draw careful distinctions between the undertakings and achievements of the school and those of the corporation itself. To further confuse matters, for most of the life of the corporation, the law did not require that a corporation's name contain a term identifying it as such (as G. L. c. 156D, § 4.01 [a] [1], does today). As a result, the three names borne by the corporation from 1850 through 1987 were identical to the school's names at the corresponding times. It is sometimes difficult to identify whether documents using one of these names intended to refer to the corporation or to the school.

In the face of these challenges, the Land Court judge conducted a thorough and thoughtful examination of the documents in the record. On our independent review of the documents, we agree with his analysis and conclusions.

a. Early years. There is no dispute that, when the corporation was originally created, it was an entity independent of the Commonwealth, with the capacity to acquire and hold its own property.[6] The incorporating statute subjected the

---

[6] The Commonwealth asserts that the corporation was established as a "public charitable corporation." See McDonald v. Massachusetts Gen. Hosp., 120 Mass. 432, 432 (1876), overruled on another ground by Colby v. Carney Hosp., 356 Mass. 327 (1968). We need not dwell on this assertion, as it carries little, if any, significance as to the question whether the corporation eventually became a State agency.

corporation to the laws then in effect concerning both corporations in general and "manufacturing corporations" in particular.  See St. 1850, c. 150, § 1, referencing Rev. Stat. cc. 38, 44 (1835).  The provisions concerning "manufacturing corporations" envisage commercial entities that, among other things, pay dividends to their stockholders and limit their liability.  See Rev. Stat. c. 38, §§ 23, 26.  By comparison, at least some civic-minded corporations founded contemporaneously were subjected only to the laws concerning corporations in general.  See, e.g., St. 1850, c. 95 (Charitable Association of Roxbury Fire Department); St. 1850, c. 166 (Tremont Street Medical School).  Recognizing the corporation's status as an independent body, a resolve of the Legislature in 1855 spoke of it as "[a]n incorporated institution . . . enjoying the patronage of the Commonwealth."  Resolves 1855, c. 58 (emphasis added).

Fifty-nine years after the corporation was created, in 1909, its status as an independent entity was reaffirmed by the Legislature.  A statute enacted that year overhauled the laws concerning treatment of the "insane, feeble-minded and epileptic, and . . . persons addicted to the intemperate use of narcotics or stimulants."  St. 1909, c. 504, § 1.  Such individuals were to be cared for by both "public and private institutions," all of which were to be overseen by the State

Board of Insanity.  See St. 1909, c. 504, §§ 2, 7.  The chapter of the statute devoted to the "feeble-minded" addressed two institutions:  the Massachusetts School for the Feeble-Minded -- then the name of both the corporation and the school -- and the Wrentham State School.  See St. 1909, c. 504, §§ 59-65.  The statute also contained a list of "state institutions"; this list included the Wrentham State School, but not the corporation or the school.  See St. 1909, c. 504, § 14.

b.  Later developments.  The Commonwealth argues that the corporation became a State agency as a result of events that took place from 1917 through 1921.  This history is as follows.

The corporation's board of trustees had always been composed of twelve members.  The trustees' responsibilities encompassed both the "subscriptions, donations and bequests to the corporation" and "all the interests and concerns of the school."  During the first decades of the corporation's existence, several of the trustees -- originally eight, later six -- were elected by the corporation's members, i.e., its general assembly.  The rest of the trustees were appointed by the Governor and Council.  See Resolves 1851, c. 44; Resolves 1861, c. 26.

In 1917, the "anti-aid amendment" to the Massachusetts Constitution was passed.  This amendment prohibited the appropriation of public money for "maintaining or aiding any

school . . . which is not publicly owned and under the exclusive control, order and superintendence of public officers or public agents authorized by the Commonwealth." Art. 46, § 2, as amended by art. 103 of the Amendments to the Massachusetts Constitution. In order for the school to be eligible to receive public funding after the anti-aid amendment, the trustees petitioned for legislation providing that each trustee "on the part of the corporation" would "hold office" as trustee of the school only after being "confirmed by the [G]overnor and [C]ouncil." The Legislature granted the trustees' request. See St. 1918, Special Acts c. 119 (1918 statute).

Subsequently, in 1919, the Legislature established the Department of Mental Diseases. See St. 1919, c. 350, § 79. The "state institutions" to be controlled by that department were listed in a provision of the first edition of the General Laws, enacted in 1921. This time, the "Massachusetts school for the feeble-minded," still the name both of the school and of the corporation, was named as a "state institution." G. L. c. 123, § 25 (1921 ed.).

As the Land Court judge perceived, the developments of 1917 through 1921, while modifying the management of the school, did not diminish the status of the corporation as an independent entity. To begin with, it is true that the 1918 statute granted the Governor and Council the power to approve the corporation's

trustees before they could serve the school.  But the corporation and the trustees had long recognized the trustees' separate functions in service of the corporation, on the one hand, and the school, on the other.  The corporation's bylaws of 1907, for instance, drew detailed distinctions between the powers and duties of the trustees concerning the corporation and those concerning the school (also referred to as the "institution"), stating that the trustees

> "shall have power to take any measures which they may deem expedient for encouraging subscriptions, donations and bequests to the corporation; to take charge of all the interests and concerns of the school; to enter into and bind the corporation by such compacts and engagements as they may deem advantageous . . . . [A]t every annual meeting they shall make a report in writing on the accounts of the treasurer of the corporation and of the treasurer of the institution, and of the general state of the institution . . . and an inventory of all the real and personal estate of the corporation."

(Emphasis added.)  The 1918 statute did not purport to disturb the role of the trustees in service of the corporation.  Indeed, it was only the school, rather than the corporation, that needed to maintain eligibility for funding from the Commonwealth in the wake of the anti-aid amendment; while the Legislature's appropriations had always been dedicated to the needs of the school, the corporation, as it stated in a 1917 report, had its own "private funds . . . consist[ing] of carefully invested sums received from time to time from friends of the school."

Similarly, the historical record reveals, particularly in the corporation's annual reports, that the "Massachusetts school for the feeble-minded" named as a "state institution" in 1921 was the school, not the corporation. The corporation and the school had had separate treasurers since 1907. From 1917 onward, each of the corporation's annual reports, among those in the summary judgment record, contains an accounting prepared by the treasurer of the corporation, listing the corporation's income, expenditures, and assets; and a separate accounting prepared by the treasurer of the school. The school, but not the corporation, was reported to receive much of its income from the treasury of the Commonwealth. This entire system of accounting would have been senseless if the corporation had by then become a State agency.

The substance of the trustees' reports, too, details their sometimes discrete decision-making concerning the finances of the corporation, alongside their supervision of the school. For instance, in a 1929 report, in addition to recounting news of the school, the trustees wrote that they had "passed a resolution that it is their policy to increase the principal of the Corporation Funds . . . having due regard to the emergency needs of the Institution, to the end that the income of the Funds may be available for research purposes."

There is no question that the Commonwealth was aware of the corporation's understanding that its corporate status and finances were separate from those of the school; each of the trustees' annual reports was addressed "To the Corporation, His Excellency the Governor, the Legislature, and the Department of Mental Diseases."

Thus, the corporation remained an entity independent of the Commonwealth notwithstanding the tumult that 1917 to 1921 brought to the school. After 1921, the administrative structures of both the school and the corporation remained unchanged until 1987. Control of the school was then transferred to the Department of Mental Retardation, and the Governor was charged with appointing all of the school's trustees. See St. 1986, c. 599, § 9. That the corporation remained independent of the Commonwealth throughout the period from 1921 to 1987 is illustrated by the following incident. In 1978, after the last of the Templeton transactions had taken place, an attorney requested an opinion from the Attorney General as to whether his law firm permissibly could perform services in connection with two contracts that were planned to be made between the corporation and agencies of the Commonwealth. See Attorney General Conflict of Interest Opinion

No. 829 (1978).[7] These contracts would not have been envisioned if the Commonwealth had then regarded the corporation as a State agency.

The history and character of the corporation are materially different from those of corporations that our past decisions have characterized as agencies of the Commonwealth. See, e.g., Trustees of Worcester State Hosp. v. Governor, 395 Mass. 377, 380-381 (1985) (discussing hospital established as State entity). See St. 1832, c. 163, and St. 1833, c. 95); Spence v. Boston Edison Co., 390 Mass. 604, 607-608 (1983) (discussing housing authority, defined by G. L. c. 121B, § 3, as "[a] public body politic and corporate," notwithstanding certain "characteristics" of private corporation); Benton v. Trustees of City Hosp. of Boston, 140 Mass. 13, 17 (1885) (discussing city hospital).[8] We agree with the Land Court judge, in short, that

---

[7] The attorney was a trustee of the corporation and of the school. On the facts described to him, the Attorney General concluded that the law firm was permitted to provide the services in question, because the corporation was "not a 'state agency,'" and its anticipated contracts were "not within [the attorney's] official responsibility as a trustee of [the school]."

[8] We decline the Commonwealth's invitation to address the conditions that may cause a charitable corporation to be viewed as a State agency. Suffice it to say that, as already discussed, although the school established by the corporation was supported largely by Commonwealth funds and was subject to some control by the Governor, the same was not true of the corporation.

the summary judgment record does not support the Commonwealth's theory that the corporation, at some point, became a State agency.

c. Purchases. The Templeton parcels were last conveyed in the following transactions:  (a) in 1923, the "Cowick" parcel was granted, by three separate deeds, to the "Massachusetts School for the Feeble-Minded, a corporation"; (b) in 1929, the "Dyer" parcel was granted to the "Walter E. Fernald State School, a Massachusetts corporation"; (c) that same year, the "Thompson" parcel was granted to the "Commonwealth of Massachusetts";[9] (d) also that same year, the "Norcross" parcel was granted to the "Walter E. Fernald State School"; (e) in 1939, the "Gardner Savings Bank" parcel was granted to the "Walter E. Fernald State School"; and (f) in 1969, the

---

[9] The Thompson parcel was not named in the corporation's complaint.  The Land Court judge explained, however, that both parties had addressed that parcel in their summary judgment briefs, and that the Commonwealth had reproduced the deed to the parcel in its record appendix.  The judge therefore determined that the parcel presented an "issue[] not raised by the pleadings [but] tried by express or implied consent of the parties," which, by rule, is to be "treated in all respects as if [it] had been raised in the pleadings."  Mass. R. Civ. P. 15 (b), 365 Mass. 761 (1974).  We discern no error in that decision.

"Doucette" parcel was granted to the "Walter E. Fernald State School, a Massachusetts corporation."[10]

Each of these parcels was purchased with the corporation's own funds. The trustees were openly cognizant of the fact that they were using the corporation's funds rather than drawing on those of the Commonwealth. When they contemplated purchasing the Norcross parcel, for instance, the trustees wrote that "due to the biennial session of the Legislature and our small appropriation the State could do nothing," and that, therefore, "it was voted to have the Corporation acquire said land."

After the parcels were purchased, they were listed in the corporation's reports as assets of the corporation, not the school. By contrast, when, on earlier occasions, the Legislature had provided funds for the purpose of purchasing land for the school, the appropriating enactments stated that the land would be purchased "in the name and on behalf of the Commonwealth," Resolves 1897, c. 64, or that the deed to the land would be "deliver[ed] to the treasurer of the Commonwealth," St. 1897, c. 98, § 2.

---

[10] The deeds to these six parcels are recorded in the Worcester County registry of deeds at book 2289, pages 336-337 (three deeds to Cowick parcel); book 2487, page 188 (Dyer parcel); book 2487, page 59 (Thompson parcel); book 2499, page 475 (Norcross parcel); book 2746, page 399 (Gardner Savings Bank parcel); and book 4952, page 389 (Doucette parcel). The corporation, in its brief, mistakenly counts seven parcels, for reasons that are apparent but unimportant here.

For purposes of our analysis, the deeds to the parcels fall into three categories. First, the deeds to the Cowick, Dyer, and Doucette parcels explicitly name the "corporation" as grantee. Given our conclusion that the corporation was not a State agency, there remains no question that these deeds bestow title on the corporation only.

The second category of deeds contains those to the Norcross parcel and to the Gardner Savings Bank parcel. These deeds did not state specifically that the grantee was a "corporation"; but the grantee named in them, the "Walter E. Fernald State School," was the corporation's formal name when the deeds were made. The meaning of a deed "is to be ascertained from the words used . . . construed when necessary in the light of the attendant circumstances." Patterson v. Paul, 448 Mass. 658, 665 (2007), quoting Sheftel v. Lebel, 44 Mass. App. Ct. 175, 179 (1998). The circumstances surrounding these deeds reveal that the corporation was the intended grantee. The funds used for these purchases belonged to the corporation; the Commonwealth did not reimburse the corporation for the purchases; the corporation never expressed an intent to make a gift of the land to the Commonwealth; and, after each parcel was conveyed, it was listed in the corporation's reports as an asset of the corporation.

The same circumstances attended the third category of deeds, which includes only the deed to the Thompson parcel. Although that deed names the Commonwealth as grantee, the Thompson parcel, too, was purchased by the corporation with its own funds, and it, too, thereafter was counted among the corporation's assets in the corporation's annual reports. In the absence of any suggestion that the corporation intended to gift this land to the Commonwealth, we agree with the Land Court judge that the deed's reference to the Commonwealth as grantee can only have been inadvertent.[11]

<u>Judgment affirmed</u>.

---

[11] The Commonwealth argues that, even if we determine that the corporation holds title to all of the parcels, further proceedings are necessary to determine the character of that title, and specifically whether the corporation holds the parcels in trust for the Commonwealth. We deem the argument waived, as it was not made below. See <u>Weiler</u> v. <u>PortfolioScope, Inc.</u>, 469 Mass. 75, 86 (2014), citing <u>Canton</u> v. <u>Commissioner of Mass. Highway Dep't</u>, 455 Mass. 783, 795 n.18 (2010). Although the case was decided on the corporation's motion for "partial" summary judgment, that motion was partial -- as the Land Court judge explained -- only insofar as portions of the complaint had been dismissed on the defendants' motion.